[Nos. D048643, D049848. Fourth Dist., Div. One. Jan. 2, 2008.]

JANICE DiCOLA et al., Plaintiffs and Appellants, v.
WHITE BROTHERS PERFORMANCE PRODUCTS, INC., et al.,
Defendants and Respondents.

COUNSEL

Macaluso & Associates, Todd E. Macaluso, Stacy M. King and Zachary M. Lemley for Plaintiffs and Appellants.

Harrington, Foxx, Dubrow & Canter, Michael D. Hirsch and Edward Leonard for Defendant and Respondent White Brothers Performance Products, Inc.

Marrone, Robinson, Frederick & Foster, Phillip R. Marrone and Dennis P. Defranzo for Defendant and Respondent Tolemar, Inc.

OPINION

O'ROURKE, Acting P. J.—Plaintiffs and appellants Janice DiCola, individually and on behalf of the estate of Thomas DiCola, Gina DiCola, by and through her guardian ad litem Phyllis Pearson, Christopher DiCola and Daniel DiCola appeal from summary judgments in favor of defendants and respondents White Brothers Performance Products, Inc. (White), and Tolemar, Inc. (Tolemar), on plaintiffs' wrongful death and products liability action stemming from an accident that was alleged to have occurred when a motorcycle side stand failed to retract. The trial court granted summary judgment on the grounds (1) defendants' evidence demonstrated neither White, a distributor, nor Tolemar, a manufacturer, placed the allegedly defective side stand on the market; (2) plaintiffs' evidence did not create a triable issue of material fact as to whether White and Tolemar were the distributor and manufacturer, respectively, of an exemplar side stand (example B) that plaintiffs' experts asserted was essentially identical to the subject side stand; and (3) defendants demonstrated they were not responsible for placing the subject side stand into the stream of commerce. In reaching its holding, the court rejected a declaration from plaintiffs' counsel purporting to state that example B was a product manufactured by Tolemar.

On appeal, plaintiffs contend White and Tolemar did not meet their initial summary judgment burden to show they did not manufacture or distribute the subject side stand. Plaintiffs further contend the court erred by excluding the entirety of their counsel's declaration, but they in any event raised triable issues of fact preventing summary judgment with evidence that (1) the example B side stand was identical to the allegedly defective side stand and (2) defendants manufactured and distributed the example. We affirm the judgments.

## FACTUAL AND PROCEDURAL BACKGROUND

Thomas DiCola was killed and his wife, passenger Janice DiCola, injured following an accident that occurred while they were riding on Thomas DiCola's self-built motorcycle. Thereafter, Janice DiCola, on behalf of herself and Thomas DiCola's estate, and other DiCola family members, filed a complaint against Custom Chrome Manufacturing, Inc. (Custom Chrome), and "Doe" entities, alleging causes of action for wrongful death, negligence, breach of express and implied warranties, strict product liability and "survivorship." In part, plaintiffs alleged Thomas DiCola was rounding a slight left-hand turn on northbound State Route 188 when the lowered side stand on his motorcycle (the subject side stand) came into contact with the ground and failed to automatically retract, causing him to lose control of and crash the motorcycle. Plaintiffs eventually amended their complaint to substitute White and Tolemar in as Doe defendants.

White and Tolemar each moved for summary judgment. The basis for White's motion was that the subject side stand was not its product; that it did not design, assemble, fabricate, test, inspect, manufacture, distribute, wholesale, ship or retail the subject side stand and it thus owed no duty and had no privity with plaintiffs. It presented declarations from White's operation sales manager Ken Davie, Tolemar's president Steve Ramelot, materials science expert Shahram Sheybany, Ph.D., and Gerald Zamiski, an expert with degrees in mechanical and material engineering and a Ph.D. in mechanical metallurgy. Davie explained that White manufactured exhaust systems only; that it did not manufacture, assemble, or fabricate motorcycle side stands. Further, White only sold to motorcycle dealers who sold products from storefront businesses, and Davie's review of White's sales records showed it had never sold any motorcycle accessories to Thomas DiCola. According to Davie, the only side stand that White purchased and sold that was "remotely 'visibly similar' " in appearance to the subject side stand was its "12-1200X" side stand, manufactured by Tolemar for use on Harley-Davidson Softail motorcycles.

Tolemar's president, Ramelot, averred he had closely examined the subject side stand, which had been marked with an "A," with four other side stands marked "B," "C," "D," and "E."[1] Ramelot stated that the C, D, and E side

---

[1] In all, defendants tested five other side stands against the subject side stand. Zamiski, the president of Vollmer-Gray Engineering Laboratories, Inc. (VGEL), and a failure analyst for 25 years, explained he had received the subject side stand (example A), as well as an exemplar from plaintiffs marked B (example B), an exemplar from White Brothers stated to have been manufactured by Tolemar marked C (example C), a second and third exemplar sent directly from Tolemar to VGEL, marked D and E (examples D and E), and fourth and fifth exemplars (marked 1 and 2) given by Tolemar to its counsel, who hand-delivered them to his laboratory.

stands were manufactured by Tolemar. Basing his conclusions in part from the declarations of Sheybany and Zamiski, as well as his own visual inspection and knowledge of Tolemar's manufacturing process for the 12-1200X side stands, Ramelot pointed to differences in the subject side stand with those manufactured by Tolemar, and concluded Tolemar did not manufacture the subject side stand. He stated that other companies manufactured side stands visually similar to Tolemar's 12-1200X side stand that were known as "knock-offs."

Dr. Sheybany explained that the subject side stand as well as the exemplars underwent visual and microscopic examinations, plating thickness measurements, dimensional and geometrical analysis, and radiography. "Metallurgical mounts" were taken after water-jet cutting for the subject side stand and example B and mechanical cutting was done on the other examples. These mounts were examined by a scanning electron microscope and underwent analysis with an energy dispersive X-ray microprobe. Based upon all of the physical and metallurgical testing and analysis, Dr. Sheybany observed a "large number of significant differences" between the accident side stand and the other side stands known to be manufactured by Tolemar, and he stated those differences could only have been produced by a substantially different manufacturing practice other than Tolemar's consistently used computerized numerical controlled (CNC) manufacturing machines. He noted Tolemar's CNC machining kept geometrical characteristics and dimensional tolerances within a strict limit, and the subject side stand "falls well outside of these accepted or established tolerance limits." Sheybany concluded the subject side stand was not manufactured by Tolemar based on the use of different manufacturing processes and procedures with different dimensions and tolerances, and also the fact the subject side stand had a machined weld that was then nickel-chrome plated. Dr. Zamiski reached similar conclusions.

Submitting identical declarations from Ramelot and Dr. Zamiski, Tolemar moved for summary judgment on the same ground: that the undisputed facts demonstrated Tolemar did not design, assemble, test, inspect, distribute, wholesale, ship or retail Thomas DiCola's motorcycle or any of its component parts.

In opposition, plaintiffs sought to rebut defendants' showing with declarations from experts Thomas Carnan and Peter Leffe.[2] Both Carnan and Leffe inspected the subject side stand and compared it with the example B side

---

[2] Carnan stated he had a degree in industrial technology manufacturing and 40 years of experience in manufacturing, CNC machining, material science and precision machine shop operations. Leffe averred he had a degree in mechanical engineering with metallurgy, a masters in architecture and a certificate in aviation accident investigation, and had been involved for 15 years in accident investigation evaluating mechanical and metallurgical failures.

stand. They also reviewed information from a testing laboratory that had conducted materials testing, as well as the declarations submitted by White and Tolemar. Carnan averred that all of the "minor variations" pointed out by defendants' experts could have been manufacturing variations that do not affect the form, fit or function of the part. For example, he found certain groove marks on both parts were made from the same machining process and that other sanding marks were not evidence of a different machining process or manufacturer, but were consistent with the manufacturing process of a nonprecision production part. He pointed out other variations could have been the result of differences in the sharpness or straightness of drill bits, or wear caused by other parts. He stated that similarities in the mounting brackets and bore holes demonstrated that the "parts were consistent with parts made by the same manufacturer." He also found identical machining marks in the side stands' legs to be "conclusive evidence" that the parts were made by the same manufacturer. As for the type of material, Carnan stated both the subject side stand and example B were made from the same ("1018") steel, whereas examples C and D were respectively made of "1522" and "12L14" steel. According to Carnan, that showed the bracket had been made of at least three different materials at different times, which was indicative of a manufacturing process with little consistency and the manufacturer's ability to alter the specification or dimensions at any time.

Leffe observed that the subject side stand and example B had the same general and overall dimensions, which a knock-off would not need to copy. However, he noted distortion and deformation of certain parts of the subject side stand due to the impact damage from the accident, which he maintained made measurements unreliable. He nevertheless concluded the mounting bracket's bend radius and bushings, though distorted from the accident or use, were " 'more likely than not' " identical, and had aspects that were "signature[s] of the manufacturer." In addition to other conclusions, Leffe concluded the parts were products of the same manufacturer based on similarity in manufacturing techniques, machining marks, bushings, dimensions and overall design of the part; that "while minor variations exist they are well within the limits of manufacturing tolerances. Further, minor variations can be expected over time and within the evolutionary process of a production part manufactured for non-precision application."

The court tentatively denied White's and Tolemar's motions, concluding plaintiffs had raised triable issues of material fact regarding whether certain aspects of the subject side stand were consistent with Tolemar's products. However, at oral argument on the matter, Tolemar's and White's counsel pointed out (as they had argued in their reply papers in the trial court) that plaintiffs' experts had limited their examination to a comparison of the

subject side stand and example B, which they argued had not been proven to be a Tolemar side stand. Plaintiffs' counsel responded that the example B side stand was "originally produced by Custom Chrome and represented to us as a White Brother's product." Faced with defense counsel's argument that none of those facts were included in plaintiffs' opposing papers and finding their position to be well taken, the court, sua sponte, gave plaintiffs an opportunity to present evidence to substantiate the relationship of example B to the subject side stand.

Plaintiffs thereafter refiled their opposing points and authorities, adding a new declaration from their counsel Stacy King, an associate at Macaluso & Associates. King averred that several months after plaintiffs filed their complaint against Custom Chrome, that company's attorney of record, Mortimer Hartwell, and a Custom Chrome representative inspected Thomas DiCola's motorcycle and the subject side stand. According to King, Hartwell represented to her at that time that the subject side stand was not one of theirs, but a part manufactured and distributed by White. A few days later, Hartwell repeated that information to her in a letter. King averred: "Custom Chrome's attorney then informed me that they had an exemplar of a White Brothers side stand that was identical to the subject side stand. Per our discovery request, Mr. Hartwell provided our offices with a Burly Brands side stand. The side stand that was produced is exemplar 'B' . . . . This side stand came in its original packaging for comparison to the subject side stand. [¶] . . . Exemplar 'B' was in an un-opened, vacuum-sealed package when it arrived in our office. It was identified by the label 'Burly Brands' across the top of the packaging. I opened the package and removed the side stand. Inside the package was an instruction sheet for proper mounting of the side stand. On this sheet, the side stand indicated it was a White Brothers product, part 12-1200X."

King averred that as a result of this information, plaintiffs eventually added White as a defendant, which in responses to special interrogatories "identified their packaging of the 12-1200X side stand in an identical manner to the packaging of the side stand provided by Custom Chrome." King averred that White identified Tolemar as the sole manufacturer of the 12-1200X, and stated, "I am informed and believe, and thereupon allege that Tolemar, Inc. is the sole manufacturer of the 12-1200X side stand, and that they only sell their product to White . . . for distribution and sale." King's declaration continued: "Our offices provided this side stand to both Tolemar and White . . . for testing, upon which they tested the subject side stand (identified as the subject side stand 'A'), the side stand provided by Custom Chrome and represented as that of White . . . (identified as exemplar 'B') [sic]. Furthermore, Defendants provided exemplar's [sic] 'C', 'D', 'E', and '2' [sic]. [¶] . . . Our

experts were similarly given the subject side stand and exemplar 'B' for testing. According to Defendant's chemical testing of all the side stands, and confirmed by Plaintiffs' experts, the side stands were all made from the same steel/alloy. Plaintiffs' experts have concluded that the subject side stand, exemplar 'A' . . . is identical in every way to the exemplar received from Custom Chrome, exemplar 'B' . . . which was identified by its packaging as a Burly Brands/White Brothers side kickstand. [¶] . . . I am informed and believe, and thereupon allege that the side stand given to my office by Custom Chrome was manufactured, distributed and packaged by Defendant White Brothers, and designed by Tolemar, Inc."

In reply, both Tolemar and White argued that the uncontroverted evidence before the court was that the subject side stand had " 'significant differences' " between it and the Tolemar manufactured side stands (examples C, D, E, 1 & 2), demonstrating that they were manufactured by a different person or entity. They maintained summary judgment was properly granted in part because (1) plaintiffs had failed under Code of Civil Procedure section 437c, subdivision (h) to timely proffer King's declaration, which was the only new evidence submitted by them; and (2) King's declaration relied upon inadmissible hearsay, was based on speculation, assumed facts not in evidence and lacked foundation. White also asserted that King's declaration contained improper legal conclusions. Defendants filed written objections to the contents of King's declaration.

In February 2006, the court tentatively granted White's and Tolemar's motions in a single minute order applicable to both defendants. In part, it ruled King's declaration "does not adequately prove the chain of custody establishes exemplar 'B' is from defendants. The declaration contains hearsay statements from Attorney Hartwell that are not properly before the Court." In March 2006, the court issued a combined order and judgment in favor of White and in July 2006, a separate judgment in Tolemar's favor (containing no findings). As to White, the court ruled: (1) White had proffered evidence that neither it nor Tolemar placed the subject side stand on the market; (2) plaintiffs' efforts to create a triable issue of material fact by comparing example B with the subject side stand failed in that Ms. King's declaration did not adequately prove the chain of custody establishing that White distributed or Tolemar manufactured example B and the declaration contained inadmissible hearsay statements from Hartwell; and (3) White demonstrated it was not responsible for placing the subject side stand into the stream of

commerce. Following entry of the judgments in White and Tolemar's favor, plaintiffs filed their respective appeals, which we consolidated at the parties' request.[3]

## DISCUSSION

### I. *Standard of Review*

A defendant meets his or her burden upon a motion for summary judgment or summary adjudication if that party has proved "one or more elements of the cause of action . . . cannot be established . . . ." (Code Civ. Proc., § 437c, subd. (p)(2).) The defendant need not conclusively negate an element of the plaintiff's cause of action, but must only show that one or more of its elements cannot be established. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) To shift the burden to the nonmoving party, the evidence produced by the moving party must "persuade the court that there is no material fact for a reasonable trier of fact to find. . . ." (*Id.* at p. 850, fn. 11, italics omitted.) The moving party also bears a burden of production "to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Id.* at p. 850.) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Id.* at p. 851.)

"Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists . . . ." (Code Civ. Proc., § 437c, subd. (p)(2).) In opposing the motion, the plaintiff may not simply rely upon allegations or denials of the pleadings; the plaintiff must set forth specific facts showing that a triable issue of material fact exists. (*Ibid.*) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar, supra,* 25 Cal.4th at p. 850.)

We review the trial court's decision de novo, considering all of the evidence offered in connection with the motion—except that which the court properly excluded—and the uncontradicted inferences the evidence reasonably supports. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476–477 [110

---

[3] Plaintiffs first appealed from the trial court's order and judgment in White's favor; they then filed an amended notice of appeal from the separate judgments in White and Tolemar's favor. We declined to construe plaintiffs' first notice of appeal as including the second judgment in Tolemar's favor, and thus we treat these notices of appeal as separate but consolidated appeals.

Cal.Rptr.2d 370, 28 P.3d 116].) In resolving the motion we construe defendants' evidence strictly and plaintiffs' evidence liberally, and resolve any doubts as to the propriety of granting the motion in plaintiffs' favor as the opponent. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 [107 Cal.Rptr.2d 617, 23 P.3d 1143]; *Baroco West, Inc. v. Scottsdale Ins. Co.* (2003) 110 Cal.App.4th 96, 99 [1 Cal.Rptr.3d 464].)

## II. *Defendants' Burden*

Plaintiffs contend defendants did not meet their threshold summary judgment burdens to establish they were not the manufacturer or distributor of the subject side stand. Emphasizing we must strictly construe defendants' evidence for purposes of summary judgment, they advance two reasons why their showings assertedly fail. First, plaintiffs argue defendants' experts did not show sufficient dissimilarity between the subject side stand and the examples manufactured by Tolemar in that the results of the materials testing showed the metallurgical and chemical differences between the subject side stand and the examples were minimal or nonexistent. Second, plaintiffs maintain defendants did not establish that the examples their experts tested against the subject side stand were Tolemar's model 12-1200X; that none of defendants' experts specifically stated in their declarations that examples C, D, E, 1 or 2 were that particular model, and the ambiguity as to which side stands the experts were testing requires denial of summary judgment.

Tolemar responds in part that plaintiffs misstate a product liability defendant's burden of proof as to identity or causation,[4] and that plaintiffs in any

---

[4] Tolemar relies on *McCreery v. Eli Lilly & Co.* (1978) 87 Cal.App.3d 77 [150 Cal.Rptr. 730], in which the court stated, "[I]t is not a general rule in the field of products liability that the manufacturer of a defective product prove a negative, i.e., his noncausation of plaintiff's injuries. [Citation.] It is equally true that an alleged manufacturer of a defective product need not prove the negative that it did not manufacture the product which caused plaintiff's injuries." (*Id.* at p. 83, citing *Endicott v. Nissan Motor Corp.* (1977) 73 Cal.App.3d 917, 928 [141 Cal.Rptr. 95].) The California Supreme Court disapproved *McCreery* in *Sindell v. Abbott Laboratories* (1980) 26 Cal.3d 588, 612–613 [163 Cal.Rptr. 132, 607 P.2d 924] (see *Howard Jarvis Taxpayers Ass'n v. City of La Habra* (2001) 25 Cal.4th 809, 816 [107 Cal.Rptr.2d 369, 23 P.3d 601]), at least in cases involving the drug industry, where a plaintiff who is unable to identify the particular manufacturer of a fungible drug that caused injury to her may join defendants who manufactured a substantial percentage of the market share of the drug alleged to be defective. (See *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1107 [245 Cal.Rptr. 658, 751 P.2d 923].) In such a case, the defendants would be liable unless they could disprove their involvement. (*Id.* at p. 1108.) *Sindell* distinguished the circumstances present in that case from those where a plaintiff who is injured by a defective product is unable to identify which of two manufacturers had produced the product and only one of the two defendants was alleged to have manufactured the product. (*Sindell, supra*, 26 Cal.3d at p. 603, fn. 18, distinguishing *Garcia v. Joseph Vince Co.* (1978) 84 Cal.App.3d 868 [148 Cal.Rptr. 843].) The circumstances in this case are like the latter situation in that there is only one manufacturer of the side stand

event did not make these arguments in the trial court, thus waiving such a challenge on appeal. White likewise argues plaintiffs have waived these contentions, having made them for the first time on appeal.

Though this court is bound to determine whether defendants met their threshold summary judgment burden independently from the moving and opposing papers, we are not obliged to consider arguments or theories, including assertions as to deficiencies in defendants' evidence, that were not advanced by plaintiffs in the trial court. "Generally, the rules relating to the scope of appellate review apply to appellate review of summary judgments. [Citation.] An argument or theory will . . . not be considered if it is raised for the first time on appeal. [Citation.] Specifically, in reviewing a summary judgment, the appellate court must consider only those facts before the trial court, disregarding any new allegations on appeal. [Citation.] Thus, possible theories that were not fully developed or factually presented to the trial court cannot create a 'triable issue' on appeal." (*American Continental Ins. Co. v. C & Z Timber Co.* (1987) 195 Cal.App.3d 1271, 1281 [241 Cal.Rptr. 466].) "A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant." (*Ernst v. Searle* (1933) 218 Cal. 233, 240–241 [22 P.2d 715].)

We reject plaintiffs' assertion in reply that their opposition papers specifically addressed how defendants did not meet their initial summary judgment burden. To support that assertion, they block-cite the entirety of their opposition papers, failing to point out precisely where those arguments were made. Our review of their opposition papers reveals that while plaintiffs generally addressed Tolemar's burden, they made no argument challenging Tolemar's evidence as they do on appeal. Plaintiffs responded to Tolemar's contention that there was no triable issue as to the fact it did not design, manufacture, assemble, fabricate, test, inspect, manufacture, distribute, wholesale, ship or retail the subject side stand by arguing they (plaintiffs) had presented evidence that Tolemar had manufactured and sold the subject side stand; that *plaintiffs'* evidence showed "[t]he geometrical design, dimensions, metallurgic similarities, and manufacturing similarities positively conclude [*sic*] that the defective side stand is identical to the Defendant's product." Plaintiffs made identical arguments in opposition to White's motion, and also argued broadly that White's separate statement improperly contained legal conclusions.

---

that is alleged to be defective; the side stand is not a fungible product manufactured by multiple entities. We agree the general principles on which *McCreery* relied apply here.

There is no suggestion in plaintiffs' opposition papers before the trial court that Tolemar or White had not met their initial summary judgment burdens because they had not established sufficient metallurgical or chemical differences, or that their experts did not state that examples B, C, D, 1 or 2 were in fact 12-1200X models. We agree principles of forfeiture and "theory of the trial" prevent plaintiffs from making these arguments for the first time on appeal. (See *Saville v. Sierra College* (2005) 133 Cal.App.4th 857, 872–873 [36 Cal.Rptr.3d 515]; *North Coast Business Park v. Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 28–29 [21 Cal.Rptr.2d 104], disagreed with on other grounds in *San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 315 [125 Cal.Rptr.2d 499]; *Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 879 [242 Cal.Rptr. 184].)

■ Were we to consider plaintiffs' arguments on the merits, however, we would reject them. First, we agree with Tolemar that plaintiffs misstate defendants' summary judgment burden. As a general rule, a plaintiff claiming to have been injured by a defective product must prove that the defendant's product, or some instrumentality under the defendant's control, caused his or her injury. (See *Sindell v. Abbott Laboratories, supra,* 26 Cal.3d at pp. 597–598; *Garcia v. Joseph Vince Co., supra,* 84 Cal.App.3d at pp. 873–874, citing Annot. (1973) 51 A.L.R.3d 1344, 1349, fns. omitted [" 'Regardless of the theory which liability is predicated upon, whether negligence, breach of warranty, strict liability in tort, or other grounds, it is obvious that to hold a producer, manufacturer, or seller liable for injury caused by a particular product, there must first be proof that the defendant produced, manufactured, sold, or was in some way responsible for the product' "]; 63 Am.Jur.2d (1997) Products Liability, § 154, p. 196.) Plaintiffs do not seek to fall within any exception to that general rule; they did not for example allege the subject side stand was a generic item produced by several manufacturers, as in a situation where a plaintiff might seek to rely on a theory of market share liability. (See *Ferris v. Gatke Corp.* (2003) 107 Cal.App.4th 1211, 1216, fn. 1 [132 Cal.Rptr.2d 819]; fn. 4, *ante.*) In a market share situation, a plaintiff " ' " 'need only allege inability to identify the actual manufacturer and join as defendants those manufacturers that compose a "substantial share" of the market. . . . Th[e] theory shifts the burden of proof to each manufacturer to prove its innocence . . . . [¶] . . . A defendant can avoid liability only by proving that it did not produce the specific product that harmed the plaintiff.' " ' " (*Ferris,* at p. 1216, fn. 1.)

Thus, Tolemar and White's initial summary judgment burden was met merely by "present[ing] evidence that would preclude a reasonable trier of fact from finding . . . it was more likely than not . . . the material fact [i.e., Tolemar had manufactured and White distributed the subject side stand] was

true." (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003 [4 Cal.Rptr.3d 103, 75 P.3d 30].) Or defendants could "establish . . . an element of the claim cannot be established, by presenting evidence . . . the plaintiff 'does not possess and cannot reasonably obtain, needed evidence.' " (*Ibid.*) Here, defendants met their threshold burden with evidence from Ramelot, who expressly stated in his declaration that examples "C, D and E were manufactured by Tolemar, Inc.," and experts Sheybany and Zamiski, who tested and inspected the subject side stand as well as examples C, D, E, 1 and 2. Based on differences in established or accepted tolerances, dimensions and manufacture that according to the experts could not have occurred with Tolemar's computerized manufacturing process, Ramelot, Sheybany and Zamiski concluded the subject side stand was not manufactured by Tolemar.

Contrary to plaintiffs' arguments, Sheybany and Zamiski did not look solely to metallurgic and chemical differences in the subject side stand and the examples known to be manufactured by Tolemar; rather, their opinions were based upon a threshold understanding of Tolemar's manufacturing practices as recited in Ramelot's declaration[5] and their comparison of the geometric dimensions and measurements, welding and finish markings, and nickel-chrome plating differences of the example side stands. Nor was defendants' showing deficient for any failure to demonstrate that the example side stands were Tolemar's model 12-1200X. In his declaration, Ramelot plainly identifies the examples, which were referenced in attached photographic exhibits, as model 12-1200X side stands. White's operation sales manager Davie averred in his declaration that the 12-1200X was the only side stand White sold that remotely resembled the subject side stand.

In sum, defendants' evidence was sufficient prima facie evidence that Tolemar did not manufacture (and White did not distribute) the subject side (*Aguilar, supra,* 25 Cal.4th at p. 850), thus meeting their initial summary judgment burden and shifting the burden of producing controverting evidence to plaintiffs.

---

[5] Ramelot described aspects of the manufacturing process for Tolemar's 12-1200X side stands, explaining (1) the mounting brackets were produced by a hydraulic press with a dedicated form die set to create specified bends (either one and one-half inch or 11/16th inch diameter bends, depending on the production timeframe); (2) a computerized numerically controlled milling machine was used to produce the 12-1200X's spring hole into which the mounting bracket fit; and (3) all of Tolemar's 12-1200X side stands were chrome plated before leaving its manufacturing plant.

### III. *Plaintiffs' Evidence Was Insufficient to Raise a Triable Issue of Material Fact as to Whether Defendants Manufactured or Distributed the Subject Side Stand*

In opposing summary judgment, plaintiffs sought to raise triable issues of fact that the subject side stand was one manufactured and distributed by defendants with evidence from experts Carnan and Leffe, who testified about similarities between the subject side stand and the example B side stand. However, neither expert testified about example B's origins, and the trial court sustained defendants' objections to plaintiffs' opposing evidence as lacking in proof linking example B to defendants' products.

On appeal, plaintiffs contend they raised triable issues of material fact pertaining to the "chain of custody" of example B by King's declaration, which they assert "contained enough facts to prove that exemplar 'B' was the defendants' product," and that the court erred in rejecting the entirety of King's declaration in the face of defendants' objections. Plaintiffs acknowledge that some portions of King's declaration as to her conversations with Attorney Hartwell might have been correctly ruled hearsay, however, they maintain her declaration nevertheless "provides factual assertions establishing the handling of the side stand, the description of its packaging, the procedure of opening the package, the contents, and what actions were taken by her after she opened the package." Relying on *Newport v. City of Los Angeles* (1960) 184 Cal.App.2d 229 [7 Cal.Rptr. 497] for the proposition that in viewing a summary judgment declaration the court must look not only to its contents but also to documents it incorporates, they argue King's declaration, coupled with example B's unopened, vacuum-sealed packaging and instruction sheet, established example B was a product manufactured by Tolemar and distributed by White.

We review the trial court's evidentiary rulings on summary judgment for abuse of discretion. (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 139–140, fn. 3 [127 Cal.Rptr.2d 145]; *Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 192, fn. 15 [70 Cal.Rptr.2d 96].) As the parties challenging the court's decision, it is plaintiffs' burden to establish such an abuse, which we will find only if the trial court's order exceeds the bounds of reason. (*In re Marriage of Eben-King & King* (2000) 80 Cal.App.4th 92, 118 [95 Cal.Rptr.2d 113].) "Where a trial court has discretionary power to decide an issue, an appellate court is not authorized to substitute its judgment of the correct result for the decision of the trial court." (*Ibid.*) We will only interfere with the lower court's judgment if appellant can show that under the evidence offered, " 'no judge could reasonably have made the order that he did.' " (*Smith v. Smith* (1969) 1 Cal.App.3d 952, 958 [82 Cal.Rptr. 282].) Plaintiffs' showing will be "insufficient if it presents a

state of facts which simply affords an opportunity for a difference of opinion." (*In re Marriage of Eben-King & King*, at p. 118.) As we explain, we conclude the court did not abuse its discretion in sustaining defendants' hearsay objections to King's declaration, which was the sole evidence by which plaintiffs sought to establish that example B—the only side stand plaintiffs' experts inspected, tested and compared to the subject side stand— was Tolemar's product.

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Generally, hearsay evidence is inadmissible unless the law provides an exception for its admission. (Evid. Code, § 1200, subd. (b).) Double hearsay is admissible if each level falls within an exception to the hearsay rule. (*People v. Zapien* (1993) 4 Cal.4th 929, 950–952, 956 [17 Cal.Rptr.2d 122, 846 P.2d 704].) Statements that are not offered to prove the truth of the matters asserted do not constitute hearsay.

As stated, plaintiffs make no serious argument challenging the trial court's hearsay ruling as to Attorney King's declaration recapping her conversations with Custom Chrome's Attorney Hartwell and his statements about the manufacturer and distributor of the side stand identified as example B. Those statements by King are plainly hearsay to the extent they are offered to prove the truth of Hartwell's statements. That is not the case with King's statements describing how she handled the package and the fact it appeared unopened and sealed; those are statements within her personal knowledge. However, King went on to state that example B "was identified by the label 'Burly Brands' across the top of the packaging" and "[i]nside the package was an instruction sheet for proper mounting of the side stand." She continued: "On this sheet, the side stand indicated [*sic*] that it was a White Brothers product, part 12-1200X." Appended to King's declaration was a paper in part reading: "BURLY [¶] BRAND [¶] White Brothers Softail Low Bro Side Stand [¶] Installation Instructions [¶] Part # 12-1200X." Thus, through King's declaration, plaintiffs sought to use the package label and enclosed sheet to prove that the content of the package—example B—was a Tolemar 12-1200X side stand distributed by White. The question at hand is whether the product package and enclosed instruction sheet constitute inadmissible hearsay if offered in this manner.

We answer the question in the affirmative. Both defendants specifically objected to the above-referenced statements of Attorney King on hearsay

grounds.[6] The package labeling reading "Burly Brands" as well as the instruction sheet in this case constitute hearsay because they are extrajudicial assertions offered to prove the truth of the matter asserted, namely, that the box contained a "Burly Brands" model 12-1200X product. (Accord, *In re Michael G.* (1993) 19 Cal.App.4th 1674, 1677 [24 Cal.Rptr.2d 260] [information on label relative to ingredients of spray can was hearsay, but properly admitted under a recognized exception to the hearsay rule under the compilation exception of Evid. Code, § 1340].) When offered for this purpose, the written information on the package and instruction sheet and any in-court reading of that information is inadmissible. King's declaration purporting to recite this written information is inadmissible double hearsay.

Plaintiffs did not argue in the trial court nor do they contend on appeal that King's declaration on these points or the packaging should fall within a recognized hearsay exception.[7] We conclude the information on the packaging and sheet was hearsay not shown to fall within any possible hearsay exception, and thus the court properly excluded King's declaration as to those matters.

None of plaintiffs' contentions convince us to reach a different result. Plaintiffs maintain that King's declaration contains "factual assertions" but that argument ignores the hearsay nature of her recitation of example B's packaging and its contents, and the hearsay nature of the packaging and instruction sheet themselves. Nor does plaintiffs' reliance on *Newport v. City of Los Angeles, supra,* 184 Cal.App.2d 229, assist them. In *Newport,* the court held that triable issues of fact could be raised by documents in the record that have been incorporated by reference into a supporting affidavit. (*Id.* at pp. 234–236.) However, we have previously acknowledged that *Newport* predated statutory amendments mandating a separate statement. (*North Coast Business Park v. Nielsen Construction Co., supra,* 17 Cal.App.4th at p. 30, fn. 5.) Thus, *Newport*'s viability is questionable, but we in any event fail to see how its holding assists plaintiffs. There is no indication here the trial court ignored the documents appended to King's declaration; in fact, its

---

[6] Neither defendant objected to the declaration on *double* hearsay grounds, but in our view, the objection was preserved because the trial court was "fairly apprise[d] . . . of the issue it [was] being called upon to decide." (*People v. Scott* (1978) 21 Cal.3d 284, 290 [145 Cal.Rptr. 876, 578 P.2d 123]; accord, *People v. Samuels* (2005) 36 Cal.4th 96, 120 [30 Cal.Rptr.3d 105, 113 P.3d 1125].)

[7] For example, a writing is admissible as a business record if it was made in the regular course of business, at or near the time of the relevant event, the "custodian or other qualified witness testifies to its identity and the mode of its preparation," and the "sources of information and method and time of preparation were such as to indicate its trustworthiness." (Evid. Code, § 1271, subds. (a)–(d).) Plaintiffs made no such showing in the trial court as to example B's packaging or instruction sheet.

evidentiary ruling encompassed the entirety of her declaration, which included the attached documents. Further, assuming *Newport*'s proposition has not been abrogated by later statutory amendments, as a general proposition, a court assessing the sufficiency of an affidavit provided in support or opposition to summary judgment is not prevented from considering evidentiary challenges to documents appended to the declaration.

Plaintiffs further assert without any analysis or authority that "Exemplar 'B' *itself* was sufficient to establish that it was the defendants' product." We decline to consider this point absent reasoned explanation. (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115 [75 Cal.Rptr.2d 27] [rejecting plaintiff's summary judgment arguments in brief that cited "only general legal principles without relating them to any specific facts or admissible evidence"]; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 [87 Cal.Rptr.2d 754] ["An appellate court is not required to examine undeveloped claims, nor to make arguments for parties"].)

Having upheld the trial court's evidentiary ruling as to King's declaration, we need not address plaintiffs' further contentions that they raised triable issues of material fact by their experts' comparison of example B to the subject side stand, an argument premised on the asserted "fact" that example B was manufactured by Tolemar and distributed by White. Nevertheless, we touch on certain assertions made by plaintiffs to dispose of any notion that the court's rejection of King's declaration had no bearing on the outcome of defendants' motions.

In part, plaintiffs maintain they met their burden by pointing to discovery responses in which White assertedly "described its packaging of the 12-1200X side stand as identical to the packaging of the side stand provided by Custom Chrome, Exemplar 'B.'" If plaintiffs intend to suggest White admitted in this discovery response that example B's packaging was identical to its packaging for the Tolemar 12-1200X side stand or somehow otherwise authenticated the packaging (Evid. Code, § 1414), the argument is unavailing. In the cited discovery response (response No. 60 to plaintiffs' special interrogatories, set 1), White was asked to describe in detail the package in which it sold, distributed or delivered the product to the ultimate consumer, retailers or distributors. It responded that the history of ownership of the subject side stand was unknown, that it was likely designed and manufactured by Tolemar and sold to Thomas DiCola by an unknown vendor at the Long Beach Swap Meet,[8] and that there was no evidence to date indicating it ever sold or was sold the subject side stand. It then described its packaging "as it

---

[8] These discovery responses were verified by White's representative and served in April 2005, well before White and Tolemar filed their motions for summary judgment in November 2005.

relates to 'similar kickstands[,]' . . . at or about the time of the subject accident. . . ." White did not reference example B in any way, and its discovery response does not constitute a judicial admission that example B is a product it sold or distributed or that its packaging is identical to that used by it during the relevant time period.

■ Plaintiffs also point to statements made by Michael Hirsh, White's counsel. First, they state he "identified and represented in Janice DiCola's deposition that a White Brother 12-1200X side stand comes in a gray and white vacuum-sealed package labeled 'Burly Brands.' " But Hirsh's statement was merely part of a question he asked of Janice DiCola during her deposition. Counsel's unsworn statement is not evidence (see *Fuller v. Tucker* (2000) 84 Cal.App.4th 1163, 1173 [101 Cal.Rptr.2d 776]), and to avoid summary judgment, plaintiffs must produce admissible evidence raising a triable issue of fact. (*Crouse v. Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509, 1524 [80 Cal.Rptr.2d 94]; *Pacific Gas & Electric Co. v. City of Oakland* (2002) 103 Cal.App.4th 364, 371 [126 Cal.Rptr.2d 660].)[9]

Plaintiffs next point to Hirsh's declaration submitted by White in reply to plaintiffs' opposing summary judgment papers, in which he identified White's packaging and instruction sheet and stated the former was "a true and correct exemplar of the packaging that encompasses all 12-1200X side stand sold by White Brothers" and the latter "a true and correct exemplar of the 'Instruction Sheet' that is placed within the packaging of all 12-1200X side stand sold by White Brothers." From this, plaintiffs argue: "This packaging and instruction sheet were *identical* in every way to the packaging and instruction sheet of Exemplar 'B.' By comparing those two exemplar packages, one can recognize precisely the exact same *logos*, *bar code*, and *instruction sheets*. There is no question that Exemplar 'B' was packaged in a manner identical to what counsel for White Brothers declared was the packaging of all 12-1200X's [*sic*]." The flaw in this argument is that it is only an assertion made in plaintiffs' brief unaccompanied by any reference to the record to expert testimony or analysis; plaintiffs have not pointed to *evidence* demonstrating that a comparison of example B's packaging and instruction sheet shows it is "identical" to that known to be produced by White.

■ In short, these arguments do not convince us that plaintiffs raised triable issues of material fact establishing that example B was a Tolemar product apart from King's declaration. The trial court properly granted the summary judgments in defendants' favor.

---

[9] There is no significance to the fact Hirsh stated during the deposition he was "representing" that the packaging he showed to Ms. DiCola was the "Burly Brand 12-1200X Side Stand packaging as put out by White Brothers." That does not render his unsworn assertion admissible evidence.

## DISPOSITION

The judgments are affirmed.

Aaron, J., and Irion, J., concurred.