Filed 8/21/20  S.T. v. D.B. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| S.T., | B294472 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YF005928) |
| v. | |
| D.B., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Angela Villegas, Commissioner.  Affirmed.

Law Offices of Herb Fox and Herb Fox for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

_____

Father challenges the trial court's order extending Father's child support for his incapacitated Daughter beyond her 18th birthday. He argues the trial court improperly relied on personal knowledge of purported facts outside the record, applied an incorrect legal standard to determine Daughter was incapacitated from earning a living, and erroneously failed to determine his ability to pay. We affirm.

I

We summarize the facts leading to the trial court's order.

A

Daughter is 20 years old. In August 2014, when Daughter was 14 years old, Mother and Father entered into a stipulation regarding child custody and child support. The stipulation stated Father would pay Mother $250 per month in child support. The amount reflected the fact that Father was on permanent disability and Mother received about $497 each month in Supplemental Security Income due to Father's disability. Mother and Father had joint legal custody, and agreed Mother had primary physical custody and Father had visitation rights. In April 2015, the trial court incorporated the stipulation into a judgment of parentage.

In March 2018, a month before Daughter turned 18, the Los Angeles County Child Support Services Department asked the trial court to determine whether Daughter was "incapacitated from earning a living and without sufficient means" under Family Code section 3910, subdivision (a), and if so, to order Father to continue paying child support until Daughter was no longer incapacitated. In a motion filed at Mother's request, the County stated Daughter was "diagnosed with attention deficit hyperactivity disorder, emotional disturbance, and other related

learning/developmental disabilities." Daughter also received special education services under an Individualized Education Program.

The County attached five exhibits to this motion to extend support for an adult incapacitated child. The first exhibit was the April 2015 judgment incorporating Father and Mother's stipulation regarding child custody and child support.

The County next attached the first pages of four documents: Daughter's 2015 Individualized Education Program evaluation, Daughter's 2016 Individualized Education Program evaluation, a 2017 speech and language report, and a 2017 psycho-educational report. In a declaration, the County's attorney explained the full documents contained confidential information and likely should not be part of the court file, but the County would "lodge complete copies with the court before the hearing and have them available for the court's in-camera review on the hearing date."

The first page of the 2015 Individualized Education Program evaluation stated Daughter's primary disability was emotional disturbance. According to the evaluation, Daughter had difficulty building and maintaining relationships, acted inappropriately, and acted unexpectedly in social situations. Daughter also regularly exhibited signs of unhappiness or depression. These conditions impaired her ability to focus on schoolwork, which affected "her ability to make adequate progress within the general education curriculum without additional support." Daughter was also eligible for the Individualized Education Program "under a secondary condition of other health impairment due to [attention deficit hyperactivity disorder]."

The first page of the 2016 Individualized Education Program evaluation identified Daughter's primary disability as emotional disturbance, and her secondary disability as "Other Health Impairment."

The first pages of the 2017 speech and language report and the 2017 psycho-educational report also noted Daughter's emotional disturbance and attention deficit hyperactivity disorder diagnoses.

As the third exhibit, the County attached to the motion two February 8, 2018 letters from the Social Security Administration stating Daughter received $517 each month in Social Security benefits and $318.15 each month in Supplemental Security Income. Another letter dated January 2, 2018, identified Daughter's attention deficit hyperactivity disorders as the medical basis for these benefits.

As the fourth exhibit, the County attached a January 22, 2018 letter stating Daughter's diagnoses were attention deficit hyperactivity disorder, borderline intellectual functioning, learning/developmental disability, and a repaired atrial septal defect.

Finally, the County attached Mother's completed and signed January 5, 2018 Income and Expense Declaration.

The County redacted Mother's address, phone number, and email address from these documents.

As far as the record shows, Father did not file an opposition.

B

We turn to the December 7, 2018 evidentiary hearing. Mother and Father represented themselves. The County's counsel appeared for the County.

4

The County informed the trial court the Social Security Administration was reviewing whether Daughter was still eligible for Supplemental Security Income now that she was 18 years old.  The County also described to the trial court the documents attached to its motion to extend support for an adult incapacitated child.  The County presented other documents including complete versions of Daughter's Individualized Education Program evaluations and medical reports, the first pages of which the County filed with the motion.  The County also provided one of Father's workers' compensation pay stubs dated October 15, 2018, and a letter Father wrote to Mother dated June 18, 2015.

Father moved for a continuance, stating his surprise and confusion as to why case documents described Daughter as "incapacitated."  The court denied this request and explained the purpose of the hearing was to determine whether Daughter was "incapacitated from earning a living," which was "a different kind of incapacitated" from the type requiring a conservator.  The trial court stated it was looking at whether Daughter "is suffering from something that prevents [her] from fully becoming independent and taking care of herself" and added "it could be a temporary thing, or it could be a permanent thing."  The trial court would decide whether Daughter needed "a little extra support going forward."

The trial court then asked if there were any objections to the court reviewing in camera the documents the County provided.  Mother and Father had no objections.  Father reviewed the same documents.

Next, the trial court asked Mother why she believed Daughter was incapacitated.  Mother stated Daughter had

struggled since elementary school and faced new struggles after turning 18 as they tried "to get her out there and interact in the world." Daughter had breakdowns and suffered from anxiety. She suffered from post-traumatic stress disorder after being kidnapped about two years earlier. She attended therapy to address these issues. Daughter previously attended a school for students with learning disabilities, but Mother homeschooled her for the last two years of high school because it was difficult for her to be in a regular school setting. Daughter earned her diploma after Mother petitioned to the state to allow Daughter to graduate with the state's minimum requirements instead of "regular high school requirements." Daughter enrolled in college but had to withdraw. Mother took her to horse therapy to "keep her going and show you're doing something." But according to Mother, Daughter was "not capable of getting out there and getting a job and just doing it."

Mother said a regional center recently approved Daughter for special day classes to teach her life skills. The trial court responded: "I have some familiarity with the regional center system from my prior employment. I didn't work for a regional center, but I used to work as an administrative law judge, and I heard cases that involved the regional center. So I'm familiar with what the regional center requires in terms of being qualified to get their services, and I'm also familiar with some of the services that they provide."

Mother explained Daughter would attend social skills classes at the regional center two or three times a week, to prepare her "to be able to go out there and work at some point." The center also would provide therapy and counseling.

The trial court also asked: "What are the regional center's goals to accomplish this year? Because they always have a goal or a set of goals. So what are the goals for this year?" Mother said developing social skills was a primary goal, and confirmed the classes would teach "basic functional things to help prepare her for more sophisticated interaction with the world."

The trial court noted Daughter's attention deficit hyperactivity disorder and emotional disturbance diagnoses usually would not qualify Daughter for regional center services. The court and Mother discussed Daughter's borderline intellectual functioning and atrial septal defect diagnoses, and Mother believed the atrial septal defect—for which Daughter had triple bypass surgery when she was two years old—contributed to Daughter's struggles.

Mother also told the trial court it could take her three to four hours to deescalate Daughter's anxiety. Three months before the hearing, Daughter jumped out of the car into traffic. Mother called Father for help, and eventually called the police. Mother brought Daughter to a hospital, and the staff there "was able to calm her and speak with her."

Mother hoped Daughter could be self-sufficient at some point. It was difficult "just getting her to do functions around the house" or make it out of the house.

The trial court addressed Father, and stated: "We certainly have some diagnoses that we're aware of here. And as you can see from the conversation that we had, I have some awareness of what a regional center would be looking at in terms of how functional a person is, and they typically don't provide services if the person is capable of functioning. Usually the regional center has to be able to determine that the person has a substantial

7

impairment in their life before they will extend services, so we can all just kind of be aware of that."  The court asked for Father's perspective.

Father said he understood where Mother was coming from, but Daughter "knows what she can get away with her mom and she knows what she can get away with her dad."  He appreciated all Mother's efforts but did not "understand why this is happening."  Father said "[Daughter will] do one thing with me, and then she'll do another thing with [Mother].  And I understand [Mother] overextending herself and doing this and going to horse therapy and all this type of stuff.  But I know my daughter, and my daughter will perform as an adult."  He told the court Daughter was not incapacitated "[f]rom earning a living or anything."

Mother told the trial court Daughter had spent "[z]ero" time with Father over the last two years, but Mother would call Father when she did not know where to turn.

Mother pulled up the regional center report on her phone and offered to show it to the trial court to "clarify what [Daughter's] diagnosis was."  The trial court said it did not need to see the report as long as it was consistent with the other documents, but suggested Mother show it to Father.  The court said, "If you want [ ] the court to look at that, if you think it's necessary for me to see it, you would need to share with [Father] first.  If you don't think that you want the court to look at it, then I don't have to.  I already have knowledge of what the regional center's criteria would be."  Mother decided not to show the report.

After further discussion, the trial court found Daughter "may be a person who needs a little bit more time to get up to

being capacitated to earn a living." The court did not "think the regional center would have become involved if [Daughter] were able at this point to take care of herself" and granted the extension of child support. The court did not think the extension would be permanent and ordered the parties to return in August 2019 for a status review hearing to assess Daughter's progress.

The trial court also stated: "We don't have the issue of the amount of child support before the court, so that can't change right now. But the court can grant the extension, and I can grant the request to come back on a later court date as [Father] had asked for. We're just going to leave things as they are for [the] time being." Father told the court he could not pay the $250 each month. He said he was on disability and had nothing in his bank account. The trial court again said the child support amount issue was not before the court, and said Father could file a motion asking the court to review it. Father repeated he could not afford to pay $250 each month in child support, and stated he could try to give $125 each month. The trial court reiterated it could not address the issue at this hearing but Father could file papers with the court and contest the amount. The court ordered the County to prepare a written order.

C

Father filed a notice of appeal on December 13, 2018. The trial court announced its intended ruling at the December 7, 2018 hearing but did not enter the written order until January 14, 2019, so Father's notice of appeal was premature. (See Cal. Rules of Court, rule 8.104(c)(2).) Nonetheless, we treat the notice of appeal as timely filed immediately after the trial court entered its January 14, 2019 order. (Cal. Rules of Court, rules 8.104(d)(2) & (e); see *Castillo v. Glenair, Inc.* (2018) 23 Cal.App.5th 262, 275.)

9

## II

We review a trial court's decision to grant adult child support for abuse of discretion. (*In re Marriage of Drake* (2015) 241 Cal.App.4th 934, 939.)

## A

The County brought its motion to extend child support for Daughter under Family Code section 3910, subdivision (a), which states: "The father and mother have an equal responsibility to maintain, to the extent of their ability, a child of whatever age who is incapacitated from earning a living and without sufficient means."

Father first argues the trial court improperly "relied on inadmissible personal knowledge of purported facts to fill in the evidentiary gaps created by the lack of competent evidence of [Daughter's] actual ability to be employed." Specifically, Father argues the trial court "relied on and cited to personal knowledge of procedures and standards by the Regional Centers in order to find that [Daughter] was, in fact, incapacitated to earn a living."

Father forfeited this argument by failing to raise it in the trial court. (*DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 676.) We do not consider arguments or theories raised for the first time on appeal, including those alleging deficiencies in the opposing party's evidence. They must be raised in the trial court. (*Ibid.*) Father's status as a self-represented litigant does not relieve him of this obligation. (See *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.) Father did not object when the trial court referenced its knowledge of regional center procedures, and cannot raise the issue for the first time on appeal.

Further, the trial court's reference to regional center procedures did not prejudice Father. Father incorrectly claims the trial court relied on personal knowledge of regional center procedures "to fill in the evidentiary gaps" to find Daughter incapacitated. Evidence already was ample. Documents showed Daughter received special education services under an Individualized Education Program and had attention deficit hyperactivity disorder, borderline intellectual functioning, and learning/developmental disability diagnoses. Mother testified Daughter had breakdowns, suffered from anxiety, and suffered from post-traumatic stress disorder after being kidnapped about two years earlier. Mother homeschooled Daughter because Daughter struggled in a regular school setting. Daughter had to withdraw from college. It was difficult "just getting her to do functions around the house" or make it out of the house. It could take Mother three to four hours to deescalate Daughter's anxiety. Three months before the hearing, Daughter jumped out of the car into traffic. She did not calm down until Mother took her to a hospital.

Mother testified she lived with Daughter "day to day" and Father spent "[z]ero" time with Daughter over the last two years. After hearing testimony from Mother and Father, the trial court decided to accept Mother's testimony that Daughter was "not capable of getting out there and getting a job and just doing it." The court's reference to regional center procedures was peripheral.

Father's argument that the trial court improperly relied on and referenced "personal knowledge of procedures and standards by the Regional Centers" thus errs.

11

B

Father next contends the trial court applied the wrong standard to determine Daughter's incapacity to earn a living. This contention is unsound.

Father claims the trial court's standard to determine Daughter's incapacity was whether Daughter needed "a little extra support" or "a little more time" to earn a living. He argues this "loose and vague standard could make parents obligated to continue to support adult children who are underachievers or for other [reasons] are unwilling to accept an entry level or minimum wage job." To the contrary, the trial court explained to Father that whether Daughter was "incapacitated from earning a living" meant whether she was "suffering from something that prevents [her] from fully becoming independent and taking care of herself." This is the correct standard under California case law. (See *In re Marriage of Drake*, *supra*, 241 Cal.App.4th at p. 940 [incapacitated from earning a living means " 'an inability to be self-supporting because of a mental or physical disability or proof of inability to find work because of factors beyond the child's control.' "].) Using this standard, the court found Daughter could not take care of herself and could not earn a living on her own.

Father argues the primary purpose of Family Code section 3910, subdivision (a) "is to help assure that the child does not become a public ward" and implies the standard involves whether Daughter can "hold any kind of gainful employment." The trial court found Daughter lacked the capacity to earn a living precisely because she could not take care of herself or hold any kind of gainful employment.

The trial court used the phrases "a little bit more time" and "a little extra support" to describe what Daughter needed as

12

someone who lacked capacity to earn a living, not to determine whether Daughter was incapacitated in the first place. Because the trial court did not think Daughter's incapacity was permanent, it explained Daughter might gain the capacity to earn a living with "a little bit more time." With continued support from her parents, Daughter had "a lot of potential" to become self-sufficient. There was no error here.

Father also argues "there was no testimony by a psychological or vocational expert establishing [Daughter's] actual condition and her inability to work" but cites no authority requiring expert testimony on this point.

The trial court applied the correct standard to determine Daughter's incapacity to earn a living.

C

Finally, Father argues we must reverse because the trial court did not determine whether Father could pay the $250 per month and did not set an amount according to a mandatory guideline formula.

Father claims Family Code section 3910, subdivision (a) "requires, on its face, that the trial court make a finding not only that the adult child is incapacitated but also that the parents have the ability to pay post-majority support." This argument is mistaken. Under the statute, "father and mother have an equal responsibility to maintain, to the extent of their ability, a child of whatever age who is incapacitated from earning a living and without sufficient means." (Fam. Code, § 3910, subd. (a).) The phrase "to the extent of their ability" refers to the *extent* of the parents' duty under the statute, not the *existence* of that duty. (*Bryant v. Swoap* (1975) 48 Cal.App.3d 431, 438 [defining "to the extent of their ability" in former Civil Code section 206, repealed

13

and reenacted as Family Code section 3910, subdivision (a) without substantive change].)  The phrase has no bearing on whether the obligation arises in the first place, but rather describes what the parents must do to fulfill that obligation.  (*Ibid.*)  As a matter of law, it makes no sense to say this duty appears and disappears depending on the parents' assets.  (*Ibid.*)

The only issue the trial court decided was whether Father's *duty* to continue supporting Daughter existed.  At the hearing, the County's counsel explained there was no pending motion to modify the child support amount, "[s]o the only issue that remains is the extension of support."  The County's motion requested the court extend Father's "duty to pay support" if the court determined Daughter was incapacitated from earning a living.  As the trial court correctly noted, "We don't have the issue of the amount of child support before the court, so that can't change right now."

Father objected many times and told the trial court he could not pay the $250 each month.  The trial court reiterated it could not address the issue at this hearing but Father could file a motion to contest the amount at any point before the next hearing.  Counsel for the County told the court Father was welcome to file for relief, but his April 30, 2018 income and expense declaration "would seem to indicate that he could afford the [$250]."  Father did not file an opposition to the County's motion to extend child support, and did not file any other documents to contradict what his April 30, 2018 income and expense declaration apparently stated.

Father cites three cases in arguing Family Code section 3910, subdivision (a) required the trial court to set the child support amount according to the guidelines in Family Code

sections 4052–4055: *In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1156–1157; *In re Marriage of Sorge* (2012) 202 Cal.App.4th 626, 640–641; and *In re Marriage of Hall* (2000) 81 Cal.App.4th 313, 316–317.  However, the trial courts in all three cases decided a motion to *modify* a child support order, rather than simply to *extend* the order.  (*Drake*, at p. 1148; *Sorge*, at p. 634; *Hall*, at p. 315.)  There was no pending motion to modify child support here.  The trial court thus could not change the child support amount using statutory guidelines or other means. There was no abuse of discretion.

## DISPOSITION

We affirm.  We award costs on appeal, if any, to Mother.

WILEY, J.

WE CONCUR:

BIGELOW, P. J.

GRIMES, J.

15