Filed 3/28/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| FRANCISCO LORENZO et al., | B331177 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 19STCV23612) |
| v. | |
| CALEX ENGINEERING, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Malcolm H. Mackey, Judge. Reversed.

Mardirossian Akaragian, Garo Mardirossian, Armen Akaragian, Adam Feit; Ehrlich Law Firm and Jeffrey I. Ehrlich for Plaintiffs and Appellants.

Horvitz & Levy, Eric S. Boorstin, Scott P. Dixler; Callahan & Blaine, Brian J. McCormack and John D. Van Ackeren for Defendants and Respondents.

_____

Plaintiffs Francisco Lorenzo and Angelina Nicolas appeal from a grant of summary judgment in favor of defendants Core/Related Grand Avenue Owner, LLC (Core/Related), Tishman Construction Corporation of California (Tishman), and Calex Engineering, Inc. (Calex).[1] Defendants are, respectively, the owner, general contractor, and excavation contractor for a construction project in downtown Los Angeles. Plaintiffs sued defendants for wrongful death after Stanley Randle, a subcontractor's employee driving a dump truck from his home to a staging area, struck and killed plaintiffs' two minor daughters, Amy and Marlenne Lorenzo.[2]

Plaintiffs presented evidence that Core/Related represented to the City of Los Angeles (the City) that all dump trucks would be staged on-site at the construction project, with no more than 20 trucks present at a time. The City granted an excavation permit on that basis, with the condition that staging be on-site only. There was evidence that public safety was an important factor in the City's approving the on-site construction site and related hauling routes.

In contravention of that permit and Core/Related's representations to the City, defendants' trucking subcontractor set up an off-site staging area miles from the construction project. On the day of the accident, Calex ordered 90 dump trucks to that unpermitted staging area. Plaintiffs' theory of liability is

---

[1] Although other parties remain in the case as defendants, we will refer to respondents Core/Related, Tishman, and Calex as defendants for ease of reference.

[2] Because of common surnames of the child victims and one of their parents, we will refer to Amy Lorenzo and Marlenne Lorenzo by their first names. We mean no disrespect.

defendants' decision to establish an unpermitted staging area and direct 90 dump trucks to it was negligent, and led to the death of the two girls.

The trial court granted summary judgment upon concluding defendants did not owe a duty of care to the decedents. We disagree.

Civil Code section 1714 " 'establishes the default rule that each person has a duty "to exercise, in his or her activities, reasonable care for the safety of others." [Citation.]' [Citation.]" (*Kuciemba v. Victory Woodworks, Inc.* (2023) 14 Cal.5th 993, 1016 (*Kuciemba*).) Our Supreme Court has recognized, however, that public policy concerns may justify absolving defendants of that general duty of care, and has provided a series of factors, commonly called the *Rowland*[3] factors, for courts to consider when deciding whether to apply such an exemption. Here, defendants had a general duty to conduct their construction project with reasonable care for the safety of others. The question is whether the *Rowland* factors justify an exception to that duty when defendants implement an unpermitted staging area for construction vehicles.

We answer that question in the negative. As set forth in our Discussion, defendants' decision to establish an unpermitted dump truck staging area, without the City assessing the site and the streets approaching it for safety or implementing additional safety measures, foreseeably created a risk a truck driving to the unpermitted area would strike a pedestrian. Although the direct cause of the accident was the truck driver, case law makes clear a defendant nonetheless owes a duty to the extent the defendant's

---

[3] *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*).

negligence increases the risk of the third party's conduct, in this case, unsafe driving through streets that have not been assessed for safety given the location and usage of the unpermitted staging site. Defendants are morally blameworthy for violating their permit and misrepresenting their staging plan to the City. Recognizing a duty in this case will not unduly burden developers and contractors—rather, it will encourage them to comply with their permitting obligations.

We further reject defendants' alternative argument that as a matter of law, their conduct did not proximately cause the accident.

Accordingly, we reverse.

## FACTUAL SUMMARY

Core/Related is the owner of a three-acre parcel of real property in Los Angeles bounded by Grand Avenue, First Street, Second Street, and Olive Street. In 2018, Core/Related planned to construct two mixed-use high-rise towers on the property (the project).

The City required Core/Related to obtain a haul route and soil exportation permit to excavate and haul dirt away from the project site (the exportation permit). As part of the permit application, the City required Core/Related to specify the location of a truck staging area—the location where trucks wait before receiving excavated dirt from the site—and the number of trucks that will be staged. The City also required a "haul route map showing the project site, all involved streets along the hauling route, and the direction of travel to and from the end of the route." (Boldface omitted.)

In determining whether to grant the permit, the City will consider, among other matters, the effect of the hauling plan "on

4

vehicular and pedestrian traffic in the affected area." (L.A. Mun. Code, § 91.7006.7.5(3).) In response to an application, the City's Department of Public Works may "recommend conditions to be imposed on the hauling operations to protect the public health, safety and welfare," and the City's Department of Transportation may "recommend any traffic control measures deemed necessary to protect the public health, safety and welfare." (*Id.*, § 91.7006.7.5(2)–(3).) A City engineer testified the relevant City agencies, upon review of the permit application, might say they " 'don't like' " a proposed staging area, or that the staging area is " 'not allowed' " or allowed only with a set number of trucks. The City might also determine that only on-site staging is permissible. The engineer stated that "safety of the public" "is a factor" in approving a staging plan.

A Calex representative similarly testified haul routes are specified so that the trucks "don't wander" or "impact local traffic or streets or neighbors." When asked by plaintiffs' counsel whether "part of the reason why there are haul routes [is] to keep trucks out of neighborhoods where there could be pedestrian traffic and [to] try to avoid trucks running over pedestrians," the Calex representative responded, "That would definitely make sense to me, yes." A Tishman representative also testified the development of haul routes takes into account pedestrian and motorist safety.

In its application for the exportation permit, Core/Related represented that the truck staging area would be at the project site, and that no more than 20 trucks would be staged on-site at one time. During the City's review of the application, an agent for Core/Related responded to a City engineer's inquiry about a staging plan by stating, "All trucks [h]auling the dirt will be

5

staging on site foot print" and that a secondary staging area would not be needed. In a later e-mail, the agent reiterated, "All staging is going to be done on-site," and any staging plan "would likely just show trucks sitting on-site." Core/Related's application also included descriptions and maps of the routes that trucks would take from the project site to the dump site and from the dump site back to the project site. The record does not indicate the City's application process sought, nor did Core/Related provide, descriptions or maps of routes that truck drivers would travel to the staging area at the project site prior to commencing a day's work. The City approved the exportation permit application on the condition, among others, that staging be "allowed on site only."

Core/Related hired Tishman as the general contractor for the project. Under their agreement, Tishman would "supervise, administer, coordinate and manage" the construction in accordance with their contract and legal requirements, and "comply with all federal, state and local statutes, laws, rules, regulations, ordinances, codes and orders applicable to [the project]." Tishman agreed that it would perform its services under the agreement so as to comply with "all the obligations, responsibilities and liabilities" that Core/Related assumes "toward . . . the City of Los Angeles . . . so far as such obligations and responsibilities are applicable to the [project]." Tishman also agreed to "[s]upervise, manage and monitor the performance" of other contractors in accordance with all legal requirements.

Core/Related hired Calex to be the project's excavation trade contractor. Calex agreed that in performing its work, it would comply with all applicable laws and the requirements of governmental authorities. Calex also agreed to be responsible for

6

ensuring that its subcontractors comply with the same legal obligations. Calex further agreed it would have "full responsibility . . . for all acts and omissions (whether willful, negligent, or otherwise) of every subcontractor and such subcontractor's employees. All work, acts, [and] omissions . . . of every subcontractor and such subcontractor's employees shall be deemed those of [Calex] for all purposes of the contract" between Core/Related and Calex. (Capitalization omitted.) Calex further agreed to "follow the approved haul route."

Calex hired Commodity Trucking (Commodity) to broker trucks to haul dirt away from the project site.[4] Commodity has a "For Hire" motor carrier permit issued by the California Department of Motor Vehicles and is licensed by the United States Department of Transportation "as a common carrier of property (except household goods) by motor vehicle." (Boldface omitted.) Commodity, which owned about 70 dump trucks at the time, subcontracted with Los Morales to provide additional trucks for the project. According to the contract, Los Morales and its employees were not employees of Commodity. Los Morales employed Randle as a dump truck driver.

Notwithstanding the condition in the exportation permit requiring that truck staging for the project be on-site, Commodity selected and used the intersection of 23rd Street and Broadway in Los Angeles as a staging area for the project's dump trucks. The City engineer testified that, had the City's building and safety department known of the unpermitted staging site, defendants "would be warned to not do that. And if there was a

---

[4] Calex contracted with Commodity through an entity called Rivera Trucking.

7

second violation, . . . their approval could be revoked, thus putting the permit in jeopardy."

At the unpermitted staging area, truck drivers would check in with a dispatcher, or "load counter," employed by Commodity, who would send the trucks intermittently to the project site as requested by a Calex employee. Truck drivers were told a specific route to take from the staging area to the project site. At times, the line of trucks waiting to be sent to the project site could extend south from 23rd Street to 37th Street (according to one witness) or 39th Street (according to another).

Each day, Calex determined how many trucks would be needed the next day and informed Commodity. A Tishman representative testified that, on average, 50 to 60 trucks would enter and leave the project site each day. On April 3, 2019, the day before the accident at issue in this case, Calex requested Commodity to provide 90 dump trucks for the following day. That evening, Los Morales directed Randle to be at the 23rd Street and Broadway staging area the next morning at 6:30 a.m.

On the morning of April 4, Randle drove an empty double bottom dump truck owned by Los Morales from his residence toward the staging area. A bottom dump truck is a truck with a trailer into which dirt is loaded from above the trailer and from which dirt is released from the trailer's underside. A double bottom dump truck has two such trailers and can be 50 to 60 feet long. According to one witness, these trucks have considerable blind spots and require the driver to make very wide right turns.

On the way to the staging area, Randle drove eastbound on 37th Street and stopped at the intersection of 37th Street and Broadway shortly before 8:00 a.m. As he made a right-hand turn onto northbound Broadway—14 blocks away from 23rd and

8

Broadway—he struck and killed Amy and Marlenne. Although the circumstances surrounding the children's deaths are not clear in our record, the parties agree that the deaths were caused, at least in part, by Randle's negligence. Defendants provided evidence that the incident resulted in Randle's conviction of two counts of vehicular manslaughter.

In July 2019, plaintiffs filed the underlying complaint for wrongful death based on a single cause of action for negligence against Los Morales, Randle, and Doe defendants. They subsequently substituted Core/Related, Tishman, Calex, Commodity, and others for the Doe defendants. The complaint alleged the defendants were negligent because they "owned, leased, hired, maintained, inspected, entrusted, delegated, managed, regulated, controlled, directed, entrusted and operated the subject tractor trailer combination so as to cause it to collide with [Amy and Marlenne]."

In December 2022, Core/Related, Tishman, and Calex filed motions for summary judgment on the ground that they did not owe a duty of care to the decedents. The trial court granted the motions and entered judgment accordingly.[5] Plaintiffs timely appealed.

## DISCUSSION

### A.    Applicable Law

A trial court shall grant a motion for summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a

---

[5] Commodity also filed a motion for summary judgment, which the court denied.

9

judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c); see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) We "view the evidence in the light most favorable to [the nonmovant] and draw all reasonable inferences in [the nonmovant's] favor." (*California Medical Assn. v. Aetna Health of California Inc.* (2023) 14 Cal.5th 1075, 1087.) Our review is de novo. (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 274.)

Plaintiffs have brought an action for wrongful death, the elements of which are "a tort, such as negligence, and resulting death." (*Lopez v. City of Los Angeles* (2011) 196 Cal.App.4th 675, 685.) "To establish a cause of action for negligence, the plaintiff must show that the 'defendant had a duty to use due care, that [the defendant] breached that duty, and that the breach was the proximate or legal cause of the resulting injury.' [Citation.]" (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 213 (*Brown*).)

Here, defendants' motions for summary judgment addressed only the first element, duty. "Recovery for negligence depends as a threshold matter on the existence of a legal duty of care." (*Brown*, *supra*, 11 Cal.5th at p. 213.) Whether such a duty exists and the scope of that duty are questions of law, which we consider de novo. (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1213.)

Civil Code section 1714 sets forth, in relevant part, the general rule of duty: "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself." (Civ. Code, § 1714, subd. (a); see

10

*Kuciemba*, *supra*, 14 Cal.5th at p. 1016.) " 'This statute establishes the default rule that each person has a duty "to exercise, in his or her activities, reasonable care for the safety of others." [Citation.]' [Citation.]" (*Kuciemba*, *supra*, at p. 1016.)

"[T]he rule of Civil Code section 1714, though broad, 'has limits.' [Citation.]" (*Kuciemba*, *supra*, 14 Cal.5th at p. 1016.) "It 'imposes a general duty of care on a defendant only when it is the defendant who has " 'created a risk' " of harm to the plaintiff, including when " 'the defendant is responsible for making the plaintiff's position worse.' " ' [Citation.] 'The law does not impose the same duty on a defendant who did not contribute to the risk that the plaintiff would suffer the harm alleged. Generally, the "person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another" from that peril.' [Citation.]" (*Ibid.*)

Even when Civil Code section 1714 otherwise would apply, "public policy concerns [may] outweigh" that "broad principle" (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1143 (*Kesner*)), and "justify a departure from Civil Code section 1714's default rule of duty." (*Kuciemba*, *supra*, 14 Cal.5th at p. 1021; see also *ibid.* ["exceptions [to the general duty of care] can be recognized when supported by compelling policy considerations"].)[6]

## B.   Defendants Owed Plaintiffs a Duty of Care

Plaintiffs' theory of liability is that defendants negligently arranged and/or approved an unpermitted staging area requiring

---

[6] Exceptions to Civil Code section 1714 may also be established by statute. (See *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771 (*Cabral*).) Defendants do not contend a statutory exception applies in this case.

11

dump trucks to maneuver through pedestrian-heavy streets, leading to the fatal accident. Defendants' summary judgment motions require us to address two questions: Do these circumstances impose a general duty of care on defendants, and, if so, do public policy concerns justify an exception to that duty?

As to the first question, we conclude defendants' owed plaintiffs a general duty of care. Defendants collectively initiated and/or managed a construction project requiring 90 dump trucks, some 50 to 60 feet long, to drive through downtown Los Angeles over the course of many days. We may take judicial notice that downtown streets in Los Angeles are crowded with vehicles and pedestrians. (Evid. Code, § 452, subd. (g).) It is common sense that sending large numbers of heavy construction vehicles down those streets creates a risk of harm to those other vehicles and pedestrians. Defendants therefore had a duty " ' "to exercise, in [their] activities, reasonable care for the safety of others." [Citation.]' [Citation.]" (*Kuciemba, supra*, 14 Cal.5th at p. 1016.)

Defendants' appellate briefing focuses on the second question, whether policy concerns justify an exception to the general duty. "In determining whether public policy considerations weigh in favor of . . . an exception" to the general rule, "the most important factors are 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' " (*Kesner, supra*, 1 Cal.5th at

12

p. 1143, quoting *Rowland, supra*, 69 Cal.2d at p. 113; accord, *Cabral, supra*, 51 Cal.4th at p. 771.)  The first three *Rowland* factors " 'involve[ ] foreseeability and the related concepts of certainty and the connection between plaintiff and defendant. . . .' [Citation.]"  (*Kuciemba, supra*, 14 Cal.5th at p. 1021.)  The remaining factors—moral blame, preventing future harm, burden, and availability of insurance—embody public policy concerns.  (*Id.* at p. 1022; see *Kesner, supra*, 1 Cal.5th at p. 1145.)

In considering the *Rowland* factors, courts do not ask whether they " 'support an exception to the general duty of reasonable care on the facts of the particular case before us, but whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy.'  [Citations.]"  (*Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1083 (*Vasilenko*).)  Thus, in evaluating the foreseeability factor, for example, we do not " 'decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather . . . evaluate more generally whether *the category of negligent conduct at issue* is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed . . . .'  [Citations.]" (*Cabral, supra*, 51 Cal.4th at p. 772, some italics added; see also *Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 57–58 (*Bigbee*) [what must be foreseeable is the general character of the event or harm, not its precise nature or manner of occurrence].)

We reiterate that, based on plaintiffs' theory of liability, the " 'category of negligent conduct at issue' " (*Cabral, supra*, 51 Cal.4th at p. 772) is defendants' authorization and/or implementation of an unpermitted staging area for construction vehicles.  The question is whether public policy should absolve

13

defendants of a duty to pedestrians struck by one of those construction vehicles as it drives to the unpermitted staging area.

Before turning to that question, we must address defendants' contention that they bear no responsibility for the staging area, which was arranged by Commodity. There are triable issues as to defendants' involvement in and approval of that decision. Core/Related obtained the excavation permit, including representing to the City through its agent that all staging would be done on-site, and the municipal code required Core/Related as owner of the project to "be responsible for the work to be performed in accordance with the approved plans and specifications and in conformance with the provisions of this Code." (L.A. Mun. Code, § 91.7008.6.) A witness testifying in deposition on behalf of Tishman acknowledged that because there was not enough room for trucks to stage on-site, he had a "hunch that there was an off-site stage somewhere for the trucks." A Calex representative testified Calex learned of the off-site staging area "the day before we started hauling." Given this evidence, defendants cannot establish as a matter of law for purposes of summary judgment that they had no responsibility for, or did not at least implicitly approve, the off-site staging.

We turn now to the *Rowland* factors.

### 1.    *The* Rowland *foreseeability factors weigh against an exception to the duty of care*

Applying the first *Rowland* factor, we note that foreseeability in this context " 'is not to be measured by what is more probable than not, but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct.' [Citation.] One may be held accountable for creating even ' "the risk of a

14

slight possibility of injury if a reasonably prudent [person] would not do so" ' [citation]" (*Bigbee, supra,* 34 Cal.3d at p. 57), even if that possibility is an injury caused by the negligence of a third party (*id.* at pp. 58–59). Under this standard, when, as here, the defendants establish an unpermitted staging area for construction vehicles, thus bypassing the City's safety evaluation, there is a possibility of a traffic-related accident as those vehicles approach the staging area.

Defendants argue, "[T]hey could not have reasonably foreseen that a contractor's use of a staging area at 23rd Street could cause an accident at 37th Street. The accident had nothing to do with the staging area—it happened because the truck driver . . . drove unsafely while taking an indirect route from his home." Defendants contend, "[T]he accident here had nothing to do with risks posed by off-site staging, if any."

This argument disregards that, because defendants had assured the City they would not be staging dump trucks off-site, the City had no opportunity to assess whether 23rd and Broadway was a safe place to stage trucks, including whether the neighborhood and streets surrounding that location safely could accommodate up to 90 dump trucks moving through them on a daily basis. (See L.A. Mun. Code, § 91.7006.7.5(3) [during permitting process, City reviews hauling plan's impact "on vehicular and pedestrian traffic in the affected area"].)

Nor did the City have the opportunity to consider or implement additional measures to prevent accidents as the trucks moved through the neighborhood. (See L.A. Mun. Code, § 91.7006.7.5(2)–(3) [as part of permitting process, City departments may "recommend conditions to be imposed on the hauling operations to protect the public health, safety and

15

welfare," and "recommend any traffic control measures deemed necessary to protect the public health, safety and welfare"].) Defendants' decision to establish an unauthorized staging area, without City approval or involvement, thus foreseeably increased the risk that one of the trucks moving towards the staging area would strike a pedestrian.

We acknowledge the record is not clear whether, had defendants sought a permit to stage at 23rd and Broadway, the City's safety evaluation would have included 37th Street and Broadway, the location of the accident, and/or included the routes the trucks would take to reach the staging area at the start of the workday. The record also does not indicate whether the neighborhood around 23rd and Broadway is any less safe an area for dump trucks to drive through than the area around the permitted construction site.[7]

These, however, are questions of case-specific fact. Although they may be appropriate questions when assessing breach and causation, they are not appropriate for duty analysis under the *Rowland* factors. (*Cabral, supra,* 51 Cal.4th at p. 772.) Put another way, assuming arguendo defendants' role in establishing the unpermitted staging site was not negligent, or did not proximately cause the accident, this does not justify establishing a general rule absolving *all* developers and

---

[7] Plaintiffs asserted below there are many elementary, middle, and high schools within a one-mile radius of the staging area, and submitted in support a school district map. The legend on the map is garbled, and therefore we cannot determine if the map supports plaintiffs' position. The trial court, moreover, sustained defendants' objection to the map on relevance, authenticity, and foundation grounds.

16

contractors of a duty of care to pedestrians struck by construction vehicles driving to an unpermitted staging area.  (*Vasilenko*, *supra*, 3 Cal.5th at p. 1083 [*Rowland* factors assess " 'whether carving out *an entire category of cases* from [the] general duty rule is justified by clear considerations of policy' "], italics added.)

To the extent case-specific facts may be taken into account in assessing defendants' duty, there was evidence the line of trucks at the staging area at times extended past 37th Street, where the accident took place.[8]  This undercuts defendants' suggestion, which the dissent echoes (see dis. opn. *post*, at p. 8), that the accident site was too distant from the staging area for the staging area to have had anything to do with the accident or that 37th and Broadway would not have been within the scope of the City's safety analysis of the staging area.

Even absent evidence of the size of the staging area, defendants have not shown for purposes of summary judgment that the City's safety evaluation, had it been conducted, would not have included an assessment of the streets approaching the staging area and whether the immediate neighborhood safely could accommodate numerous large construction vehicles moving through it.  (See Code Civ. Proc., § 437c, subd. (p)(2) [defendant moving for summary judgment has initial "burden of showing that . . . one or more elements of the [plaintiff's] cause of action . . . cannot be established"].)  That the City might have conducted such an evaluation is not, as the dissent argues, "speculation."  (Dis. opn. *post*, at p. 10.)  The City's engineer

_____

[8]  The trial court sustained a relevance objection to the evidence that the line of trucks extended to 39th Street.  Because that evidence speaks to the size of the staging area, we do not agree it was irrelevant.  The trial court erred in excluding it.

testified the "safety of the public" is a consideration in approving a staging area. Calex's representative agreed the reason for approved haul routes was to minimize "impact" on "local traffic or streets or neighbors" and "to keep trucks out of neighborhoods where there could be pedestrian traffic and [to] try to avoid trucks running over pedestrians." It is a reasonable inference that any safety evaluation of the staging area, a key part of the hauling route, would include an assessment not only of the site itself but of the surrounding neighborhood and approaching streets through which the trucks would be driving. We reject the dissent's characterization of the hauling route evidence as "irrelevant." (Dis. opn. *post*, at pp. 3–4.)

Defendants' cited authorities do not undercut our foreseeability analysis. *Bryant v. Glastetter* (1995) 32 Cal.App.4th 770 (*Bryant*) held it was not foreseeable that a defendant's driving while intoxicated would lead to a tow truck driver being struck and killed by another motorist while the tow truck driver was impounding the defendant's vehicle. (*Id.* at pp. 774, 779–780.) The appellate court reasoned the killing of the tow truck driver by a third-party motorist "was not a 'harm of a kind normally to be expected' as a consequence of [the defendant's] negligent driving, such as a collision or narrowly averted collision involving [the defendant]." (*Id.* at p. 779.) "Even without being intoxicated, . . . [the defendant] might well have ended up by the side of the road and in need of a tow truck for any number of reasons which might have involved varying degrees of negligence. Other than making it more probable that decedent would be in the place in which the accident happened, [the defendant's] consumption of alcohol did not make more probable the accident that occurred, which was the result of

18

independent negligence by a third party." (*Id.* at pp. 779–780.) Put another way, "there is no logical cause and effect relationship between [the defendant's intoxicated driving] and the harm suffered by decedent except for the fact that it placed decedent in a position to be acted upon by the negligent third party." (*Id.* at p. 782.)

Defendants also cite *Sakai v. Massco Investments, LLC* (2018) 20 Cal.App.5th 1178, a decision of this division. In *Sakai*, the plaintiff accidentally backed his vehicle into another car while exiting the defendant's crowded parking lot. (*Id.* at p. 1182.) As the plaintiff attempted to exchange insurance information with the driver of the other car, the other driver suddenly got back into his car and drove off at a high rate of speed, striking the plaintiff and dragging him into the street. (*Ibid.*) We held that the defendant parking lot owner did not owe the plaintiff a duty of care, in part because "the conduct of the driver [who injured plaintiff] was not foreseeable or derivative of [the defendant's] conduct in designing, leasing or operating the parking lot." (*Id.* at p. 1186.)

*Bryant* and *Sakai* are not analogous to the instant case. Although the *Bryant* defendant was negligent for driving while intoxicated, the court concluded that negligence was unrelated to the harm that befell the tow truck driver, and therefore did not foreseeably create risk beyond what all tow truck drivers face when towing vehicles from freeway shoulders. Similarly, any negligence of the *Sakai* defendant in designing or managing its parking lot had no connection to the plaintiff's injury, which was the result of a third party's unforeseeable response to a fender bender.

19

Here, in contrast, defendants' decision to establish an unpermitted staging area, without providing the City an opportunity to assess safety or implement additional safety measures, foreseeably increased the risk of vehicular accidents as construction vehicles moved through the area. Although the direct cause of plaintiffs' harm was the negligence of the truck driver, there nonetheless was a "logical cause and effect relationship" between defendants' alleged negligence and the harm that occurred. (*Bryant*, *supra*, 32 Cal.App.4th at p. 782.) The foreseeability factor weighs against an exception to the duty of care.

The second *Rowland* factor, certainty of injury, "is relevant 'primarily, if not exclusively, when the only claimed injury is an intangible harm, such as emotional distress' [citation]." (*Kuciemba*, *supra*, 14 Cal.5th at p. 1023.) Wrongful death is an injury "both tangible and amenable to compensation." (*Ibid.*) The second factor weighs against an exception to the duty of care.

"The third factor, 'the closeness of the connection between the defendant's conduct and the injury suffered' [citation], is 'strongly related to the question of foreseeability itself' [citation], but it also accounts for third party or other intervening conduct." (*Vasilenko*, *supra*, 3 Cal.5th at p. 1086.) "Where the third party's intervening conduct is foreseeable or derivative of the defendant's, then that conduct does not ' "diminish the closeness of the connection between defendant['s] conduct and plaintiff's injury." ' [Citation.]" (*Ibid.*)

In *Vasilenko*, a church visitor sued the church after he was struck by a motorist while crossing the street from the church's overflow parking lot. (*Vasilenko*, *supra*, 3 Cal.5th at p. 1081.) The Supreme Court concluded the third *Rowland* factor "tips

20

against finding a duty." (*Id.* at p. 1086.) "[T]he occurrence of injury results from the confluence of an invitee choosing to cross the street at a certain time and place and in a certain manner, and a driver approaching at that moment and failing to avoid a collision. . . . There is a foreseeable risk of collision whether or not the invitee or the driver is negligent. But unless the landowner [i.e., the church] impaired the driver's ability to see and react to crossing pedestrians, the driver's conduct is independent of the landowner's. Similarly, unless the landowner impaired the invitee's ability to see and react to passing motorists, the invitee's decision as to when, where, and how to cross is also independent of the landowner's." (*Ibid.*) The court found the church's "conduct bears only an attenuated relationship to the invitee's injury." (*Ibid.*)

We acknowledge that here, a third party, the truck driver, was directly responsible for the accident. Unlike in *Vasilenko*, however, the driver's conduct was "foreseeable or derivative" of defendants' alleged negligence. (*Vasilenko*, *supra*, 3 Cal.5th at p. 1086.) Because of defendants' violation of the excavation permit, the truck driver was moving through the area without the City having assessed, let alone implemented, safety measures to protect pedestrians from dump trucks driving near the new, unauthorized staging area. Defendants' violation of the permit thus potentially "impaired" the ability of the truck driver and pedestrians to move through the area safely. (*Ibid.*) Also, unlike the motorist in *Vasilenko*, with whom the church had no connection and no ability to control, the reason the truck driver was in the area was because defendants had established the unauthorized staging area there.

21

Defendants argue, "Circumstances outside of defendants' control and unconnected to the off-site location of the staging area combined to cause the accident." They note the driver parked his truck overnight near his home, "took an indirect route to avoid traffic," and drove so unsafely that he was criminally convicted. *Vasilenko* recognized, however, that a defendant could owe a duty despite a third party's intervening conduct to the extent the defendant's conduct foreseeably contributed to the risk of that intervening conduct. (See *supra*, 3 Cal.5th at p. 1086.) As we have explained, defendants controlled two critical circumstances, namely the location of the staging area, and whether that staging area was permitted with all concomitant safety considerations, including City approval and safety requirements. That is sufficient control to establish a close connection between defendants' conduct and plaintiffs' injury. The third *Rowland* factor weighs against an exception to the duty of care.

The dissent disagrees, analogizing the defendants' establishment of the staging area to the *Vasilenko* church's establishment of the overflow parking lot, and noting in that circumstance, *Vasilenko* concluded "the plaintiff's decision to cross the street under those conditions was 'independent' of the defendants' location of the parking lot." (Dis. opn. *post*, at p. 8.) The dissent argues the instant case is akin to *Vasilenko* because "the actions of Randle and the children are entirely independent of the location of the staging area." (*Ibid.*)

Absent from *Vasilenko*, however, is any indication that the church, in establishing its parking lot, bypassed legally mandated safety requirements. Elsewhere in that opinion, the Supreme Court stated, "The ability of landowners to reduce the risk of

22

injury from crossing a public street is limited," and noted the church had requested, without success, that local authorities install a traffic control device for the parking lot. (*Vasilenko*, *supra*, 3 Cal.5th at p. 1087.) In other words, there was no indication the church, apart from establishing a parking lot across the street from the church property, had increased the normal risks pedestrians undertake when they cross a street. This distinguishes *Vasilenko* from the instant case, in which defendants established a staging area for construction vehicles without the safety analysis required by the permitting process.

In the dissent's view, defendants' noncompliance with their permit had nothing to do with the accident because it occurred 14 blocks from 23rd and Broadway, when Randle was driving to work first thing in the morning on a route he, not defendants, chose. We have rejected this premise in our Discussion of the foreseeability factor, *ante*, both because it relies on case-specific facts, and because the evidence does not foreclose the possibility that the City's safety evaluation of the staging area the defendants chose, had one been conducted, would have encompassed the accident site. Again, there was testimony that the line of staged trucks sometimes stretched further down Broadway past where the accident occurred. Even absent that evidence, defendants have not shown for purposes of summary judgment that the City's safety evaluation would not have included the streets approaching the staging area.

### 2. *The* Rowland *policy factors weigh against an exception to the duty of care*

The first of the *Rowland* policy factors looks to " 'the moral blame attached to the defendant's conduct.' " (*Kesner*, *supra*, 1 Cal.5th at p. 1143.) Here, defendants were morally

blameworthy in that they misrepresented to the City the scope of their staging plan, including the location of the staging area and the number of dump trucks involved, thus depriving the City of the opportunity to assess the safety of the staging plan and implement additional safety measures.

Further, our Supreme Court has held, "[I]f there were reasonable ameliorative steps the defendant could have taken, there can be moral blame 'attached to the defendants' failure to take steps to avert the foreseeable harm.' [Citation.]" (*Vasilenko*, *supra*, 3 Cal.5th at p. 1091.) Courts may also "assign moral blame 'in instances where the plaintiffs are particularly powerless or unsophisticated compared to the defendants or where the defendants exercised greater control over the risks at issue.' [Citation.]" (*Ibid.*)

In *Vasilenko*, the high court held the church's conduct was not "particularly blameworthy" because it was "unclear what effective and affordable ameliorative steps" the church could have taken to prevent the motorist from striking the church visitor as he crossed the street. (*Vasilenko*, *supra*, 3 Cal.5th at p. 1091.) Also, "the danger of crossing public streets is one that almost all adults encounter every day, and landowners have limited ability to reduce the danger and generally exercise no greater control over the danger than the invitees who cross." (*Ibid.*)

In contrast, in the instant case, there were clear ameliorative steps defendants could have taken, notably complying with the excavation permit and sending the trucks to the on-site staging area approved by the City. Alternatively, defendants could have sought a permit for the off-site staging area, which would have allowed the City to assess the safety of the proposal and either implement or require defendants to

24

implement additional safety measures as needed.  Defendants, who were responsible for the permits and arranging for the dump trucks, also had " 'greater control over the risks at issue' " than did plaintiffs.  (*Vasilenko*, *supra*, 3 Cal.5th at p. 1091.)

Defendants argue they are morally blameless because Commodity, not they, selected the staging area.  As we have explained, there are triable issues as to defendants' involvement in or responsibility for Commodity's decision.  Defendants argue the staging area was not in fact illegal, noting deposition testimony from a Commodity representative that the City initially cited Commodity for illegal staging, but then "dropped it" because the "trucks were parked legally."  It is beyond dispute, however, that defendants did not comply with the terms of the permit or defendants' representation to the City that staging would be on-site only and limited to 20 trucks.  In so doing, they bypassed the City's permitting process for the staging plan, in which, as stated by a City engineer, the "safety of the public" was a concern.

Defendants further argue they are blameless because the selection of the staging area had nothing to do with the accident occurring 14 blocks away.  We already have rejected this argument in our discussion of foreseeability.

The dissent asserts that defendants, in establishing a staging area in violation of their permit and representations to the City, were "no more blameworthy," and, "probably less blameworthy," than had they used the approved on-site staging area.  (Dis. opn. *post*, at p. 12.)  The dissent posits "the remote and orderly dispatch of trucks to the construction site was beneficial to the downtown community" compared to on-site staging, and defendants chose off-site staging "for safety

25

purposes." (*Ibid.*)  In making this argument, the dissent suggests defendants made the right choice to unlawfully stage their trucks in the neighborhood in which Amy and Marlenne were walking because the permitted on-site staging area was near "Stanley Mosk Courthouse, a performing arts school, the financial district, and tourist destinations such as the Walt Disney Concert Hall and Grand Central Market."  (*Id.* at p. 11.)  We disagree.

Clearly the City agreed with an on-site staging, because that is what the City approved.  To the extent defendants believed off-site staging would be "beneficial to the downtown community," nothing prevented defendants from asking permission to do just that, and allow the City to weigh the competing considerations, including public safety.  We are unwilling to conclude that developers and contractors that violate their construction permits are less blameworthy than those that comply.

The dissent argues defendants' conduct does not meet the test for moral blame because there is no indication of "requisite malintent, knowledge of any harmful consequences, bad faith, or reckless indifference."  (Dis. opn. *post*, at p. 12.)  In *Kesner*, in which our Supreme Court held employers and premises owners who use asbestos have a duty of care to family members who get sick from asbestos carried home on workers' clothing, the court reasoned the defendants, "as commercial users of asbestos benefitted financially from their use of asbestos and had greater information and control over the hazard than employees' households.  Negligence in their use of asbestos is morally blameworthy, and this factor weighs in favor of finding a duty."  (*Supra*, 1 Cal.5th at pp. 1140, 1151.)  Here, also, defendants received financial benefit from the construction project, including

26

the staging of dump trucks, and "had greater information and control over the hazard" created by staging those trucks. (*Id.* at p. 1151.) Assigning moral blame under this circumstance is consistent with Supreme Court authority.

The dissent criticizes our conclusion defendants were morally blameworthy for failing to take measures to ameliorate risk, contending neither we nor plaintiffs have "identif[ied] a single safety measure that the City possibly could have directed or implemented to protect pedestrians from the risk of injury from negligent truck drivers on their way to the staging area." (Dis. opn. *post*, at p. 13.) We reject the premise of this argument. For purposes of the moral blame factor, it is not a question of the steps the City could have taken, but the steps the defendants could have taken. As we have explained, defendants could have, and should have, sought a permit for the off-site staging area, therefore allowing the City to conduct a safety evaluation of the proposed staging site and surrounding streets. Defendants cannot be excused for failing to allow the City an opportunity to conduct the evaluation.

We further note that, to the extent the dissent criticizes the plaintiffs for not offering particular evidence, it is not plaintiffs' burden to establish the existence of a duty on summary judgment. It is defendants' burden, as movants, either to negate the element or demonstrate the plaintiff does not possess, and cannot reasonably obtain, the evidence necessary to prove it. (*D.G. v. Orange County Social Services Agency* (2025) 108 Cal.App.5th 465, 470–471.) Defendants have not shown the City would *not* have lessened the risk of accident through additional safety requirements had defendants sought a permit for the off-site staging area. Merely noting plaintiffs have not yet

put forth evidence is insufficient to meet defendants' burden. (See *Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 808.)

In sum, the "moral blame" factor weighs against an exception to the duty of care.

The next policy factor, the policy of preventing future harm, " 'is ordinarily served, in tort law, by imposing the costs of negligent conduct upon those responsible.' [Citation.]" (*Kuciemba*, *supra*, 14 Cal.5th at p. 1026.) Potentially, however, that policy is " 'outweighed . . . by laws or mores indicating approval of the conduct or by the undesirable consequences of allowing potential liability.' [Citation.]" (*Ibid.*) The factor "thus examines both the positive and negative societal consequences of recognizing a tort duty." (*Ibid.*) This factor overlaps somewhat with the third policy factor, " 'the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for the breach.' " (*Kesner*, *supra*, 1 Cal.5th at p. 1143.)

Defendants argue imposing a duty on them would not avoid future harm, because "[t]rucks need to reach construction sites somehow, and there is no way to keep dump trucks off city streets short of mandating that trucks remain on project sites at all times, which would make construction projects impossible." Defendants note the importance of construction projects in addressing California's housing shortage, and argue imposing liability on developers and contractors when subcontractors' employees get into traffic accidents would increase construction costs. Defendants further argue imposing liability "would also violate the public policy favoring delegation of workplace safety to independent contractors."

28

These arguments once again disregard that defendants in this case acted in violation of a City permit, establishing an off-site staging area without permission and without the City conducting a safety assessment. Imposing liability under these circumstances would, at minimum, avoid future harm by encouraging developers and contractors to comply with their permits or seek permission for a change in use, which is not an unreasonable burden to impose. These factors weigh against an exception to the duty of care.

The dissent criticizes our reasoning for "offer[ing] no explanation as to how compliance with permit requirements or seeking permission for a different staging area could prevent future harm of the kind that occurred here." (Dis. opn. *post*, at p. 15.) This criticism, we presume, stems again from the dissent's position that, because the accident took place as Randle was driving to work, outside the control of defendants, 14 blocks from the staging area, there was nothing the City or defendants could have done to prevent the accident. (See, e.g., dis. opn. *post*, at p. 13.) For the reasons discussed in our foreseeability analysis, we reject this argument.

The dissent further argues our holding is unduly burdensome on developers and contractors because we are "impos[ing] a duty . . . to protect pedestrians along every route taken by every truck driver as they drive from their homes, perhaps dozens of miles away, to the staging area." (Dis. opn. *post*, at p. 15.) Our holding here is limited to developers and contractors that stage construction vehicles in violation of their permits and representations to the permitting authority. We express no opinion whether a developer or contractor that complies with its permits is absolved of a duty of care regarding

29

construction vehicles driving to a staging area, a question that is not before us. As for accidents taking place "dozens of miles away" from the unpermitted staging area, liability in that circumstance is a matter of proximate causation, not duty, and defendants may seek summary judgment on that basis, as we address in part C of this Discussion, *post*.

The final *Rowland* factor concerns the availability, cost, and prevalence of insurance for the particular risk at issue. Plaintiffs argue, "[L]iability insurance for construction projects is widely available and was available for this Project," and point to evidence that Core/Related purchased insurance. Defendants do not address this factor in their appellate briefing. In the absence of additional information, we conclude this factor does not weigh for or against either party's position.

Having concluded all *Rowland* factors except insurance availability weigh against an exception to the duty of care, and the insurance factor is neutral, we hold that defendants are not exempt from the general duty of care under Civil Code section 1714. The trial court erred in concluding otherwise. We do not reach plaintiffs' alternative arguments that defendants are liable under principles of negligence per se, nondelegable duty, or peculiar risk.

As this opinion and the dissent demonstrate, the *Rowland* factors are malleable because their application depends on how one frames the duty. The dissent frames its analysis by asking whether construction companies have a duty to pedestrians injured by a negligent trucker driving from his home, wherever located, to *a* construction staging area. Framing the duty this way, the dissent concludes the fact the staging area violated a permit requiring the staging area to be on-site is of no

consequence. Our opinion rejects this premise. Indeed, the fact the staging area was unauthorized is critical to our application of the *Rowland* factors to a much narrower definition of duty, which, as we have explained, does not expose construction companies to the limitless liability the dissent posits. To the contrary, the duty we recognize applies to construction companies that violate permits undeniably intended to serve, among other interests, public safety.

## C. Defendants Fail To Show Lack of Proximate Causation as a Matter of Law

Defendants argue in the alternative that summary judgment was proper because their alleged conduct did not proximately cause plaintiffs' harm. Case law recognizes that even when a defendant's conduct is a cause in fact of a plaintiff's injuries, the connection between the conduct and the injury may be so remote as not to satisfy the causation element of negligence. (See, e.g., *Shih v. Starbucks Corp.* (2020) 53 Cal.App.5th 1063, 1068–1069 (*Shih*); see *Modisette v. Apple Inc.* (2018) 30 Cal.App.5th 136, 154 [" ' "As a matter of practical necessity, legal responsibility must be limited to those causes which are so close to the result, or of such significance as causes, that the law is justified in making the defendant pay." ' "].) " 'Ordinarily, proximate cause is a question of fact which cannot be decided as a matter of law . . . . Nevertheless, where the facts are such that the only reasonable conclusion is an absence of causation, the question is one of law, not of fact.' [Citations.]" (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 353.)

Defendants' proximate causation argument parallels their argument under the *Rowland* factors that the accident was not a foreseeable result of the unpermitted staging area. Specifically,

31

they argue, "The accident did not happen at the staging area—it happened 14 blocks away, while Randle was traveling there. Randle's truck was parked near his home overnight, so Randle had to drive *somewhere* on the morning of the accident, whether to the project site or the staging area. He could have driven unsafely wherever he traveled, and he could have encountered pedestrians wherever he went. Indeed, Randle only struck Amy and Marlenne because he took a circuitous route to the staging area to avoid traffic, causing him to make a turn as they crossed the street. The off-site location of the staging area thus had little if any connection to the accident."

In support of their argument, defendants cite *Shih* as well as *Wawanesa Mutual Ins. Co. v. Matlock* (1997) 60 Cal.App.4th 583 (*Wawanesa*). In *Shih*, a coffee shop served the plaintiff a cup of hot tea filled to the brim and without a protective sleeve. (*Supra*, 53 Cal.App.5th at pp. 1065–1056.) Allegedly finding the sleeveless cup too hot to hold comfortably, the plaintiff placed the cup on a table, removed the lid, and leaned forward to sip at it. (*Id.* at p. 1065.) In doing so, she lost her balance, grabbed the table for support, and the hot tea spilled, injuring her. (*Ibid.*)

The Court of Appeal acknowledged the fullness of the cup and the absence of a sleeve arguably were causes in fact of the plaintiff's injury, in that the plaintiff's inability to hold the cup led to her leaning forward to sip at it in an awkward manner that resulted in her falling. (*Shih*, *supra*, 53 Cal.App.5th at pp. 1068–1069.) The court nonetheless concluded any defects in the cup "were 'too remotely connected with [the plaintiff's] injuries to constitute their legal cause.' [Citations.]" (*Id.* at p. 1069.)

The court reasoned, "Although it is foreseeable that a customer could lose his or her balance while seated at or rising

32

from a table, such an event is not 'within the scope of the risk' [citation] created by a restaurant's decision to serve a hot beverage that is filled to the brim or that does not have a sleeve." (*Shih*, *supra*, 53 Cal.App.5th at p. 1070.) "[N]either the failure to use a cup sleeve nor the level to which a coffeehouse employee fills a hot drink 'generally increase[s] the risk' a customer will accidentally lose his or her balance while attempting to execute the kind of unorthodox drinking maneuver [the plaintiff] performed here." (*Ibid.*) "Nor would a sleeve or a less-than-full cup mitigate the injuries reasonably expected to occur from this type of accident." (*Id.* at p. 1070, fn. 3.) The court held that "the events leading to the tea spill were, as a matter of law, too remote from the alleged defects in the cup for [the plaintiff] to prove proximate causation." (*Id.* at p. 1071.)

In *Wawanesa*, the defendant, 17-year-old Timothy Matlock, purchased some cigarettes and shared them with 15-year-old Eric Erdley. (*Supra*, 60 Cal.App.4th at p. 585.) As the boys smoked the cigarettes, they trespassed onto a private storage facility and climbed onto some logs. (*Ibid.*) Erdley accidentally dropped his lit cigarette between the logs, which caught fire and caused significant property damage. (*Id.* at pp. 585–586.) Erdley's insurance company paid for the damage, then obtained a judgment against Matlock and his father for contribution. (*Id.* at p. 586.)

The Court of Appeal reversed, finding no basis to impose liability on Matlock. (*Wawanesa*, *supra*, 60 Cal.App.4th at p. 590.) The court concluded, inter alia, that although Matlock's providing cigarettes to Erdley was a "but-for" cause of the fire, the "initial act of giving [Erdley] a packet of cigarettes and the later fire is simply too attenuated to show the fire was *reasonably*

33

within the scope of the risk created by the initial act." (*Id.* at p. 588.) "Someone who gives someone else a cigarette—even if the act of giving is itself unlawful by virtue of the receiver's age—hardly can become an insurer of any property which the cigarette may by some happenstance ignite. There must be some reason to conclude that the act of giving the cigarette creates a *fire hazard*," which in this case there was not. (*Id.* at p. 589.)

The question in *Shih* and *Wawanesa* was whether the defendant's conduct reasonably increased the risk of the plaintiff's particular harm. In both cases, the appellate court concluded the answer was no—one would not reasonably expect serving hot tea in a sleeveless cup would cause someone to slip and fall, nor that giving someone a cigarette would lead to a destructive fire.

We reach the opposite conclusion here, in which defendants, by establishing an unpermitted staging area, denied the City an opportunity to assess the safety of the hauling plan, including staging, and implement additional measures if needed to protect the public. As discussed, the record does not disclose whether, had defendants sought City approval of the staging site, the City's safety evaluation would have included 37th Street and Broadway, the site of the accident. The record does not foreclose the possibility—as noted, there was evidence the line of trucks at times extended down Broadway past 37th Street, which supports an inference a safety evaluation of the staging area would include that location. It is also a reasonable inference the City's evaluation of the staging area would include assessing whether the streets surrounding it safely could accommodate large construction vehicles moving through them. Thus, contrary to the dissent's argument (dis. opn. *post*, at pp. 12–13), it is not

34

speculative that after conducting that evaluation, the City would have considered implementing measures to reduce such a safety risk at 37th and Broadway.

There remain triable issues, therefore, as to whether defendants' violation of their permit by using an unauthorized staging area increased the very risk the permitting process was intended to avoid, in this case a construction vehicle striking and killing two pedestrians. Unlike in *Shih* and *Wawanesa*, we cannot say the link between defendants' conduct and plaintiffs' harm was so remote or attenuated to absolve defendants of liability as a matter of law. Rather, the question of proximate causation is within the province of the finder of fact.

## DISPOSITION

The judgment is reversed. Plaintiffs are awarded their costs on appeal.

<u>CERTIFIED FOR PUBLICATION</u>.


BENDIX, J.


I concur.


WEINGART, J.

35

**Rothschild, P. J., Dissenting.**

Stanley Randle is a dump truck driver employed by Los Morales Trucking (Los Morales). On April 4, 2019, he was driving his employer's dump truck from his home to a truck staging area for a construction project in downtown Los Angeles. Before reaching the staging area, he struck and killed Amy and Marlenne Lorenzo.[1] Their parents (the plaintiffs) filed a wrongful death action against Randle, Los Morales, and others involved in the construction project, including the property owner and developer Core/Related Grand Avenue Owner, LLC (Core/Related), the project's general manager Tishman Construction Corporation of California (Tishman), and the excavation trade contractor Calex Engineering, Inc. (Calex) (collectively, the defendants). Core/Related, Tishman, and Calex successfully moved for summary judgment on the ground that they did not owe a duty of care to the decedents. After the entry of judgment in their favor, the plaintiffs appealed.

The majority, in reversing the judgment, concludes that property developers and their contractors who fail to obtain a municipal permit for a truck staging area owe a duty to pedestrians to protect them from the risk that truck drivers on their way to the staging area will negligently injure them. This duty, the majority holds, applies to the protection of pedestrians along the routes the truck drivers take "to the unpermitted staging area" (maj. opn. *ante*, at p. 14), even when, as in this case, the truck drivers are traveling from their homes to the staging area prior to the start of their work day.

---

[1] I, like the majority, refer to Amy Lorenzo and Marlenne Lorenzo by their first names without intending any disrespect.

The key to the majority's holding is the lack of a city permit for the off-site staging area.  (Maj. opn. *ante*, at p. 31.)  According to the majority, if the developer or contractors had applied for and obtained a city permit to establish the staging area, the city might have conducted a safety assessment of the streets surrounding the staging area and might have implemented or required "safety measures" that might have protected pedestrians from negligent truck drivers.[2]  Because these speculative possibilities do not, under the *Rowland*[3] factors or Supreme Court precedent, justify the expansive duty the majority declares, I respectfully dissent.

### A.    *Factual Summary*

With one exception, I adopt the majority's factual summary.[4]  The exception is the discussion of designated

---

[2] The majority's rationale, which is based on an alleged violation of municipal permitting requirements, suggests a negligence per se theory of duty, under which a violation of a statute may give rise to a presumption of negligence.  (See *Walters v. Sloan* (1977) 20 Cal.3d 199, 206–207; Evid. Code, § 669.)  My colleagues, however, avoid expressly relying on this theory.  To the extent it is implicit in their reasoning, I disagree, as I explain in part B.2., below.

[3] *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*).

[4] I note that none of the defendants selected the location of the staging area; a subcontractor of Calex, Commodity Trucking, made that decision.  Core/Related, however, had represented to the City that it would provide on-site staging for the dump trucks and the City issued its excavation permit on the condition that it would do so.  Tishman agreed that it would abide by Core/Related's project obligations, and Calex agreed that

2

"haul routes." For example, the majority points to the testimony of a city engineer that the project developer's application for a construction permit requires the specification of haul routes "so that the trucks 'don't wander' or 'impact local traffic or streets or neighbors.' " (Maj. opn. *ante*, at p. 5.) The majority also recites the question plaintiffs' counsel asked of the city engineer— whether designating haul routes would " 'keep trucks out of neighborhoods where there could be pedestrian traffic and [to] try to avoid trucks running over pedestrians' "—and the engineer's response: " 'That would definitely make sense to me, yes.' " (*Ibid*.) This suggests that the defendants committed some misdeed or omission in the designation of haul routes or that they failed to ensure that truck drivers abide by the routes— suggestions that are not supported by the record. In fact, the haul routes the City of Los Angeles (the City) required the developer to designate are the route dump truck drivers must take *after* they reach the construction site and travel from that site to the dump site and the route they take returning from the dump site to the construction site.

This clarification regarding the designation of haul routes is important because by the time the truck drivers have picked up their load from the construction site, they are, to some degree, under the defendants' control with respect to the routes they travel. That part of the driver's workday, however, is irrelevant in the instant case; the relevant period is the period between the driver's departure from his home and his arrival at the staging

the acts and omissions of its subcontractors, including Commodity Trucking, shall be deemed their own. For purposes of my analysis, therefore, I will assume that the defendants are responsible for establishing the off-site staging area.

area, a period when the defendants have no control over the truck drivers or their routes to work.  (See maj. opn. *ante*, at pp. 13–14 [the question "is whether public policy should absolve defendants of a duty to pedestrians struck by one of [the] construction vehicles *as it drives to the unpermitted staging area*"], italics added.)  As to this period, the majority further, and correctly, recognizes that the City did not seek, and the defendants did not specify, descriptions or maps of routes that truck drivers would travel to the staging area or the project site prior to commencing a day's work.  (Maj. opn. *ante*, at p. 6.)

I also note the sua sponte taking of judicial notice of the fact that "downtown streets in Los Angeles are crowded with vehicles and pedestrians."  (Maj. opn. *ante*, at p. 12.)  I agree, and add that the judicially noticeable crowded downtown streets of Los Angeles include the streets surrounding and leading up to the downtown construction site located adjacent to the Stanley Mosk Courthouse, the Walt Disney Concert Hall, and the Colburn School of Performing Arts.  It is also catty corner to the Broad Museum and the Dorothy Chandler Pavilion, and within a few blocks of the Museum of Contemporary Art, Grand Central Market, and the City's financial district.  It is this situation that led Commodity Trucking to establish the truck staging area away from the construction site "for safety purposes."

B.  ***Discussion***

1.  **Application of the *Rowland* Factors**

I agree with the majority that the defendants, in managing the construction project generally, and in locating a staging area for construction vehicles in particular, are subject to the general rule that " 'each person has a duty to use ordinary care and "is

4

liable for injuries caused by his failure to exercise reasonable care in the circumstances." ' " (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771; see Civ. Code, § 1714, subd. (a).) I disagree with the majority's analysis of certain *Rowland* factors and with the majority's holding that the defendants owe a duty to protect pedestrians from the risk of being struck by a negligently driven construction vehicle on its way to an "unpermitted staging area." (Maj. opn. *ante*, at p. 14.)

As to the foreseeability factor under *Rowland*, the construction project's need for dump trucks to haul dirt away from the downtown Los Angles site required such trucks to drive through city streets and thus created a foreseeable risk that a truck driver would get into an accident and harm others on the way to the staging area, wherever it is located, whether the area is permitted or not. (See *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 560 ["traffic accidents are foreseeable"];*Cronin v. J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 126 [motor vehicle collisions are "reasonably foreseeable occurrences"].) Because the defendants requested such trucks, they contributed to that risk in the same way that an employer contributes to the risk of vehicle collisions whenever it requires its employees to go to work and they do so by driving their vehicles on streets and freeways. Even in an employer-employee relationship—which the defendants did not have with Randle or other dump truck drivers—that foreseeable risk will not result in liability on the employer.[5] (See *Hinman v. Westinghouse Elec.*

---

[5] My colleagues state that the defendants were "sending" the construction vehicles down crowded streets. (Maj. opn. *ante*, at pp. 12, 24.) This suggests a degree of control on the part of

*Co.* (1970) 2 Cal.3d 956, 961 [employer is not ordinarily liable for torts committed by an employee while going to work].)  The initial foreseeability factor thus weighs weakly, if at all, in favor of finding a duty.

I agree with the majority that there is no issue with respect to the second *Rowland* factor, the certainty of injury in this case.

With respect to the "closeness of the connection between the defendant's conduct and the injury suffered" (*Rowland*, *supra*, 69 Cal.2d at p. 113), the majority concludes that the defendants' control over "the location of the staging area, and whether that staging area was permitted with all concomitant safety considerations, including City approval and safety requirements" is "sufficient control to establish a close connection between defendants' conduct and plaintiffs' injury."  (Maj. opn. *ante*, at p. 22.)  I disagree and believe that this factor weighs heavily in favor of finding that defendants owed no duty.

*Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1083 (*Vasilenko*) is instructive.  In that case, the defendant owned a church and maintained an overflow parking lot across the street from the church.  (*Id.* at p. 1081.)  The plaintiff sought to attend a seminar at the church and when he arrived on a rainy night, a church volunteer directed him to the lot across the street. (*Id.* at p. 1082.)  There was no crosswalk or traffic signal nearby.

---

the defendants.  The defendants, however, had no control over the route truck drivers took from their homes to the staging area.  Thus, so far as our record reveals, no witness described the defendants as "sending" trucks to the staging area; rather, the defendants would simply "request" the desired number of trucks from the trucking subcontractors.  Whether, when, and how truck drivers drove to the staging area was up to them.

6

When the plaintiff attempted to cross the five-lane street in the middle of the block directly opposite the church, an oncoming car hit and injured him. (*Ibid.*) The plaintiff sued the church alleging that it created a risk of harm by maintaining the overflow lot that, in effect, required its invitees to cross the street and was negligent in failing to protect against that risk.

The *Vasilenko* court stated that the defendant, by locating its parking lot on the other side of the street and directing the plaintiff to park there, created a situation where its invitees had to cross the street in order to reach its premises. The defendant "increased its invitees' exposure to the specific dangers of that particular street crossing and . . . thereby increased the likelihood that the invitee will encounter harm at that crossing." (*Vasilenko, supra*, 3 Cal.5th at p. 1085.) Thus, the court held that the first two *Rowland* factors—the foreseeability of harm to the plaintiff and the degree of certainty that the plaintiff suffered injury—support a finding of duty. (*Ibid.*)

The court then considered the third *Rowland* factor—the closeness of the connection between the defendant's conduct and the injury suffered—and explained that "unless the [defendant] impaired the driver's ability to see and react to crossing pedestrians, the driver's conduct is independent of the [defendant's]. Similarly, unless the [defendant] impaired the [plaintiff's] ability to see and react to passing motorists, the [plaintiff's] decision as to when, where, and how to cross is also independent of the [defendant's conduct]. Because the [defendant's] conduct bears only an attenuated relationship to the [plaintiff's] injury, [the Supreme Court] conclude[d] that the closeness factor tips against finding a duty." (*Vasilenko, supra*, 3 Cal.5th at p. 1086.)

7

Here, the relationship between the defendants' selection of the staging area and Randle's negligent striking of the children is far more attenuated than the relationship between the defendant's conduct and the plaintiff's injury in *Vasilenko*. The allegedly dangerous location of the parking lot in *Vasilenko* was across the street from the defendant's church and an agent of the defendant directed the plaintiff to use the lot. The circumstances effectively "required" those using the lot to cross the street in the middle of the block on a rainy night. (*Vasilenko*, *supra*, 3 Cal.5th at p. 1082.) The Supreme Court nevertheless determined that the plaintiff's decision to cross the street under those conditions was "independent" of the defendants' location of the parking lot. Here, the defendants' truck staging area was located 14 blocks from the incident and defendants did nothing to impair Randle's ability to drive responsibly or to impair the child victims' abilities to avoid being harmed. Under the teaching of *Vasilenko*, the actions of Randle and the children are entirely independent of the location of the staging area. If there exists any connection at all between the defendants' conduct and the victims' injuries, it is extremely remote. Therefore, this factor weighs heavily in support of finding no duty.

The majority reasons that there is a close connection between the defendants' location of the staging area and the incident because the defendants "assured the City they would not be staging dump trucks off-site." (Maj. opn. *ante*, at p. 15.) As a result of that assurance, the majority explains, the City did not assess the safety of the staging location or have the opportunity to consider and implement measures to prevent accidents. (Maj. opn. *ante*, at pp. 15–16.) Neither the majority nor the plaintiffs, however, point to any evidence that the City would have

8

conducted a safety assessment of the staging area or considered or implemented any safety measures if given the opportunity. Instead, the majority and the plaintiffs rely on the following question and answer during the plaintiffs' deposition of a city engineer. When asked: "The importance of where the stage is for the [C]ity is part of the safety of the public?", the engineer responded, "I would say that is a factor for sure." (See maj. opn. *ante*, at pp. 5, 17–18, 25.) Neither this statement nor any other evidence in the record supports a reasonable inference that the City would have done anything that could have prevented a negligent truck driver who was beyond the defendants' control from striking pedestrians 14 blocks away from the staging area.[6] Indeed, although the City apparently understood that truck staging for the project would occur on the construction site and result, in the majority's words, in "large numbers of heavy construction vehicles" passing through "downtown streets . . . crowded with vehicles and pedestrians" (maj. opn. *ante*, at p. 12), the City did not designate or require defendants to establish any particular routes for dump trucks approaching the ostensible staging area/construction site at the start of the workday.

The majority also attempts to distinguish *Vasilenko* by stating that the owner of the church in that case had no

---

[6] In addition to the city engineer's statement, the majority relies on the testimony of a Calex representative concerning the reasons for having designated haul routes. (Maj. opn. *ante*, at p. 19.) Reliance on facts concerning the haul routes—that is, the routes truck drivers take between the construction site and the dump site while the defendants have some measure of control over the truck drivers—serves only to highlight the absence of relevant evidence concerning the pre-work approach to the staging area.

connection with, and no ability to control, the motorist who hit the seminarian crossing the street.  (Maj. opn. *ante*, at p. 21.) This reflects a misunderstanding of *Vasilenko*.  The issue in *Vasilenko*, as here, was "the closeness of the connection between the defendant's conduct and the injury suffered" (*Vasilenko*, *supra*, 3 Cal.5th at p. 1083, quoting *Rowland*, *supra*, 69 Cal.2d at p. 113), not any connection between the defendant and the motorist.  In *Vasilenko*, there was a connection between the defendant's conduct of locating a parking lot across the street from the church that "required" its invitees to cross the street mid-block, and the plaintiff's injury.  That connection, however, was "only an attenuated relationship" that weighed against finding a duty.  (*Vasilenko*, *supra*, at p. 1086.)  Here, the defendants' conduct of operating an unpermitted staging area and the injury suffered 14 blocks away is connected, if at all, only by speculation that the City, if it had been informed of the off-site staging area, might have designated staging area approach routes that might have avoided the particular intersection where the incident occurred.  That possible connection is far more attenuated than the closer and insufficient connection in *Vasilenko*.

The fourth *Rowland* factor, moral blame, " 'is intended to describe a high degree of moral culpability' in terms of the defendant's state of mind and the inherently harmful nature of the defendant's acts.  [Citation.]  Thus 'courts have required a higher degree of moral culpability such as where the defendant (1) intended or planned the harmful result [citation]; (2) had actual or constructive knowledge of the harmful consequences of their behavior [citation]; (3) acted in bad faith or with a reckless indifference to the results of their conduct [citations]; or

10

(4) engaged in inherently harmful acts [citation].' " (*Formet v. The Lloyd Termite Control Co.* (2010) 185 Cal.App.4th 595, 602-603 (*Formet*); see *Union Pacific Railroad Co. v. Superior Court* (2024) 105 Cal.App.5th 838, 858 (*Union Pacific*); *Laico v. Chevron U.S.A., Inc.* (2004) 123 Cal.App.4th 649, 665, fn. 4; *Sakiyama v. AMF Bowling Centers, Inc.* (2003) 110 Cal.App.4th 398, 410; *Martinez v. Bank of America* (2000) 82 Cal.App.4th 883, 896.)

The existence of a dump truck staging area, generally, is not morally blameworthy; the trucks were engaged for productive purposes and the use of a staging area allows for the orderly distribution and timing of dirt hauling services. Instead of numerous dump trucks arriving at once in an area close to the Stanley Mosk Courthouse, a performing arts school, the financial district, and tourist destinations such as the Walt Disney Concert Hall and Grand Central Market, the off-site staging area and remote dispatch system allowed for staggered arrivals and departures of dump trucks at the construction site. As one representative of the contractor that selected the staging area testified, the off-site staging area was "really for safety purposes"; if the defendants did not provide an off-site staging area, there would be "90 trucks" "circl[ing] the block" and "clogging up the center of downtown [Los Angeles]."

Moreover, regardless of whether staging occurred at the off-site location or on-site, "large numbers of heavy construction vehicles" (maj. opn. *ante*, at p. 12) still had to travel through downtown Los Angeles. Thus, although Randle might not have encountered Amy and Marlenne if the staging area had been established on-site, he and other truck drivers would still have had to travel to the staging area by driving through crowded

11

downtown city streets, exposing pedestrians to the risk of being struck by a negligent truck driver.  In short, the operation of the off-site staging area is no more blameworthy—indeed, because it was selected "for safety purposes" is probably less blameworthy—than the operation of an on-site staging area.

The majority, however, states that the defendants are morally blameworthy because "they misrepresented" that staging would occur on-site, thereby "depriving the City of the opportunity to assess the safety of the staging plan and implement additional safety measures." (Maj. opn. *ante*, at p. 24.)  The defendants did represent that they would use on-site staging only, failed to do so, and failed to obtain a permit for the staging area they used.  Even so, there is no evidence that these acts and omissions were "inherently harmful." (*Formet*, *supra*, 185 Cal.App.4th at p. 603.)  Indeed, as explained above, the record suggests that the remote and orderly dispatch of trucks to the construction site was beneficial to the downtown community.  Nor is there any basis for concluding that the defendants made any of the acts and omissions concerning the excavation permit with the requisite malintent, knowledge of any harmful consequences, bad faith, or reckless indifference.

The majority further explains that defendants could have taken ameliorative steps to avert possible harm by seeking a permit for the off-site staging area, which would have allowed the City to assess the safety of the staging area and provide for the implementation of additional safety measures.  As explained above, however, the suggestion that possible unspecified safety measures or ameliorative steps could have reduced the risk that a negligent truck driver on the way to—and 14 blocks away from—a staging area would strike a pedestrian, is entirely

12

speculative.  Indeed, the majority opinion makes numerous references to a possible safety assessment the City might have undertaken and purported unspecified safety "measures" that might have been implemented.  Neither the majority nor the plaintiffs, however, identify a single safety measure that the City possibly could have directed or implemented to protect pedestrians from the risk of injury from negligent truck drivers on their way to the staging area.

The fifth *Rowland* factor is the policy of preventing future harm.  (*Rowland*, *supra*, 69 Cal.2d at p. 113.)  As the majority notes, this policy "is ordinarily served by allocating costs to those responsible for the injury and thus best suited to prevent it." (*Vasilenko*, *supra*, 3 Cal.5th at p. 1087.)  Here, Randle is the person responsible for striking and killing Marlenne and Amy and the person who was best suited to prevent it.[7]  As the *Vasilenko* court observed, "[d]rivers and invitees, for their part, are the ones most directly involved in any given collision; they can also take significant steps to reduce the risk of injury. Drivers can reduce their speed and improve their alertness, and invitees can exercise more care in choosing the precise location and moment they cross [the street]." (*Id*. at p. 1090.)  Similarly, truck drivers on their way to a staging area can drive with care to avoid negligently hitting pedestrians.  The defendants, by contrast, had no control over Randle, his driving manner, or the route he took to reach the staging area.

Plaintiffs make no argument with respect to the preventing future harm factor.  My colleagues merely repeat their point that

_____

[7] Randle's employer, Los Morales Trucking, may also be liable under vicarious liability principles.  This issue is not before us.

13

the defendants "acted in violation of a City permit, establishing an off-site staging area without permission and without the City conducting a safety assessment." (Maj. opn. *ante*, at p. 29.) Again, *Vasilenko* is helpful. The plaintiff in that case offered the court various ideas for how the defendant church could have taken actions to reduce the risk of injuries to those who use the overflow parking lot, such as providing "crossing volunteers" or posting warning signs. (*Vasilenko*, *supra*, 3 Cal.5th at p. 1087.) Although the Supreme Court found the ideas problematic and ultimately concluded that the policy of preventing future harm weighed against imposing a duty on the defendant (*id.* at p. 1090), the plaintiff in that case identified for the court's consideration some possible actions the defendant could have taken to reduce the risk to its invitees. Here, by contrast, plaintiffs offer us nothing to consider, leaving the majority to rely on only the vague possibility that the City would conduct a "safety assessment" and implement unspecified "safety measures." Because the plaintiffs and majority fail to identify a single action for preventing future harm that a court could evaluate, we cannot meaningfully assess, as the court did in *Vasilenko*, the impact of the preventing future harm factor under *Rowland*.

Instead of explaining how imposing a duty on the defendants would prevent future harm, the majority states only that imposing liability on the defendants would "encourage[e] developers and contractors to comply with their permits or seek permission for a change in use." (Maj. opn. *ante*, at p. 29.) That is undoubtedly true in the same way that imposing fines or

14

penalties for noncompliance should encourage compliance.[8]  The majority, however, offers no explanation as to how compliance with permit requirements or seeking permission for a different staging area could prevent future harm of the kind that occurred here.  To the extent the majority's reasoning is that seeking a change to permit the off-site staging area will cause the City to produce a safety assessment and implement safety measures that could lead to the prevention of future harm, this reasoning suffers from the same flaws identified above.

The penultimate *Rowland* factor is the extent of the burden on the defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for the breach.  Plaintiffs ignore this factor.  The defendants on the other hand, persuasively assert, that imposing a duty to protect pedestrians from the risk of harm caused by negligent independent truck drivers over whom they have no control would not only increase the cost of development projects and, consequently, the cost of housing, but result in liability out of proportion to their culpability.  Indeed, the majority's holding is not limited to the 14 blocks that is the focus of this case and imposes a duty on developers and contractors to protect pedestrians along every route taken by every truck driver as they drive from their homes, perhaps dozens of miles away, to the staging area.  That disproportionality between that broad

---

[8]  According to a representative of the subcontractor that managed the staging area, after the incident that killed Marlenne and Amy, the City cited the subcontractor for staging "without a permit."  The City, however, ultimately "dropped" the matter.

15

potential liability and any culpability exposes the fallacy of the majority's broad holding.[9]

The majority acknowledges the defendants' point (maj. opn. *ante*, at p. 29), but rejects it by stating that the burden of either complying with the on-site staging requirement of the excavation permit or seeking a new permit would not impose an unreasonable burden on defendants. The issue under *Rowland*, and as framed by the majority at the outset, is the extent of the burden on the defendants of imposing a duty to exercise care to protect pedestrians from the risk of being struck by a construction vehicle as it drives to an unpermitted staging area (maj. opn. *ante*, at p. 15), not the burden of complying with an excavation permit or obtaining a new one.

Lastly, with respect to the "prevalence of insurance for the risk involved" (*Rowland*, *supra*, 69 Cal.2d at p. 113), plaintiffs state that "Core/Related purchased an [owner controlled insurance program] to ensure the entire project." The record, however, does not include any insurance policy or indicate that, if one exists or could be obtained, it would cover the risk encompassed by the majority's expansive holding. I

---

[9] The duty the majority declares is not limited to the protection of pedestrians within any specific distance from the staging area; the only limit being that the truck driver is "driv[ing] to the unpermitted staging area" when he encounters the pedestrian. (Maj. opn. *ante*, at p. 14.) Nor does it appear that the court could limit the holding by distance on any rational or principled basis. If the defendants' duty to protect pedestrians includes pedestrians 14 blocks from the staging area as in this case, it would be arbitrary to exclude pedestrians from protection who are 15 blocks away, 50 blocks away, or 50 miles away.

therefore agree with the majority that the absence of evidence in the record concerning this factor precludes us from giving any weight to it one way or the other. (See *Union Pacific, supra,* 105 Cal.App.5th at p. 868.)

The *Rowland* factors of the closeness of the connection between the defendants' conduct and the injury suffered, moral blame, the policy of preventing future harm, and the extent of the burden to the defendants all weigh in favor of finding no duty. To the extent any factors weigh in favor of finding a duty, they are easily outweighed by the factors against. Accordingly, I would hold that the defendants had no duty to protect Marlenne and Amy from the risk of being struck by a negligent truck driver over whom defendants had no control 14 blocks before reaching the staging area.

The majority's central criticism is that the "dissent concludes the fact the staging area violated a permit requiring the staging area to be on-site is of no consequence." (Maj. opn. *ante*, at pp. 30–31.) To the contrary, I do consider and weigh that fact throughout my analysis of the *Rowland* factors and give it what I consider appropriate weight.

### 2.    Other Theories of Duty

Plaintiffs assert other theories of duty, which the majority concludes it need not address.

Plaintiffs contend that defendants are liable under the doctrine of negligence per se because they violated the excavation permit's requirement that dump truck staging take place on-site only. This requirement has the effect of law, they argue, because the Los Angeles Municipal Code requires that the owner of a development project is "responsible for the work [being] performed in accordance with the approved plans and

17

specifications." (L.A. Mun. Code, § 91.7008.6.) As such, the violation of the condition creates a rebuttable presumption that the defendants failed "to exercise due care." (Evid. Code, § 669, subd. (a).)**10**

As defendants point out, plaintiffs did not make this argument below. On appeal from an order granting summary judgment, the court will not consider an appellant's argument not raised in opposition to the motion for summary judgment below. (*California Restaurant Management Systems v. City of San Diego* (2011) 195 Cal.App.4th 1581, 1594, fn. 7; *DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 676; *American Continental Ins. Co. v. C & Z Timber Co.* (1987) 195 Cal.App.3d 1271, 1281.)

Even if plaintiffs had preserved this issue for appeal, the argument is without merit. The condition was a requirement applicable "to a single parcel of property," not " 'a "broad, generally applicable rule of conduct on the basis of general public policy." ' " (*Issakhani v. Shadow Glen Homeowners Assn., Inc.* (2021) 63 Cal.App.5th 917, 930.) It was not, therefore, the "type of 'fundamental policy decisions' that are capable of forming the basis for a duty of care." (*Ibid.*)

---

**10** Evidence Code section 669, subdivision (a) provides: "The failure of a person to exercise due care is presumed if: [¶] (1) He violated a statute, ordinance, or regulation of a public entity; [¶] (2) The violation proximately caused death or injury to person or property; [¶] (3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and [¶] (4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted."

Plaintiffs further argue that defendants are vicariously liable under the nondelegable duty doctrine and peculiar risk doctrines. Under the nondelegable duty doctrine, if "an individual or corporation undertakes to carry on an activity involving possible danger to the public under a license or franchise granted by public authority subject to certain obligations or liabilities imposed by the public authority, these liabilities may not be evaded by delegating performance to an independent contractor. The original contractor remains subject to liability for harm caused by the negligence of the independent contractor employed to do the work." (*Taylor v. Oakland Scavenger Co.* (1941) 17 Cal.2d 594, 604; see *Snyder v. Southern Cal. Edison Co.* (1955) 44 Cal.2d 793, 798–800; *Eli v. Murphy* (1952) 39 Cal.2d 598, 600–601.)

Plaintiffs contend that Core/Related's duty to comply with the City's requirement that dump truck staging take place on-site was a nondelegable duty. Therefore, they argue, it cannot escape liability for Commodity Trucking's decision to locate the staging area off-site. As explained above, I have assumed for purposes of analysis that defendants are responsible for establishing the off-site staging area off-site at 23rd Street and Broadway. Even so, the scope of whatever duty defendants had with respect to the risk of harm to others in the staging area does not extend to the risk to pedestrians from negligent truck drivers 14 blocks away from the staging area. The nondelegable duty doctrine, therefore, does not aid the plaintiffs.

Under the peculiar risk doctrine, " '[o]ne who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken,

19

is subject to liability for physical harm caused to them *by the failure of the contractor to exercise* reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.' " (*American States Ins. Co. v. Progressive Casualty Ins. Co.* (2009) 180 Cal.App.4th 18, 29; see *Castro v. State of California* (1981) 114 Cal.App.3d 503, 513; *Anderson v. L.C. Smith Constr. Co.* (1969) 276 Cal.App.2d 436, 446.)

The peculiar risk doctrine has been limited to situations where "there was a direct relationship between the accident and the 'particular work performed' by [the tortfeasor].  [Citation.]  In other words, if the 'character' of the work contributed to the accident, the peculiar risk doctrine applies.  If the accident resulted from 'ordinary' use of the vehicle, the peculiar risk doctrine does not apply, notwithstanding the vehicle's size and weight." (*Bowman v. Wyatt* (2010) 186 Cal.App.4th 286, 309.) Here, the relevant "work" for which Commodity Trucking, Los Morales and Randle were hired was hauling away excavated dirt from the project site.  Although the circumstances of the accident that caused Amy's and Marlenne's deaths are not entirely clear, it appears that the deaths occurred during an otherwise ordinary right turn through an intersection—an act unrelated to the dirt-hauling character of the work for which Randle was hired.  (See *ibid.*; *A. Teichert & Son, Inc. v. Superior Court* (1986) 179 Cal.App.3d 657, 662.)  The peculiar risk doctrine, therefore, is inapplicable here.

### C.    *Conclusion*

For all the foregoing reasons, I conclude that the defendants did not owe a duty to protect Amy and Marlenne from the risk of being hit by a negligent truck driver driving

from his home to the truck staging area, and are therefore entitled to judgment as a matter of law.

ROTHSCHILD, P. J.